20834

Mary G. GREEN, Appellant, v. Eugene W. LILLIEWOOD, M.D., Respondent.

James GREEN, Jr., Appellant, v. Eugene W. LILLIEFORD, M.D., Respondent.

(249 S. E. (2d) 910)

*Ellis I. Kahn,* of *Solomon, Kahn, Roberts & Smith,* Charleston, *for appellants.*

*Robinson, McFadden, Moore & Pope,* and *Thomas D. Broadwater,* Columbia, *for respondent.*

December 11, 1978.

NESS, Justice:

This appeal is from an order granting Dr. Lilliewood's motion for a directed verdict in a medical malpractice suit brought by appellant Mary Green. We reverse.

In July 1969, the respondent, Dr. Lilliewood, inserted an intrauterine device designed to prevent pregnancy into Ms. Green's uterus. In October 1969, Ms. Green complained to Dr. Lilliewood of intermenstrual bleeding and abdominal cramps. She testified she had no problems prior to the insertion of the IUD, but that after its insertion, she developed heavy vaginal discharge and abdominal pain. Although Dr. Lilliewood treated her for these symptoms in October 1969, she returned to his office in January 1970 with the same complaints.

In June 1970, Ms. Green asked Dr. Lilliewood to perform a tubal ligation and remove the IUD. The tubal ligation was performed in July 1970 but Dr. Lilliewood failed to remove the IUD as requested. Ms. Green testified her vaginal discharge and abdominal pain continued after this surgery.

In February 1971, Ms. Green again complained to Dr. Lilliewood of pain in her lower abdomen and a heavy vaginal discharge.

Thereafter, Ms. Green was informed of the presence of the IUD in her uterus by another physician who was treating her for discharge and pain between February 1971 and September 1971. She confronted Dr. Lilliewood with this information in September 1971, and after three painful at-

tempts on three separate occasions, the IUD was surgically removed.

Ms. Green continued to suffer from abdominal pain and in June 1975, another physician surgically removed her uterus. When her discomfort did not abate, Ms. Green's right ovary was removed in April 1977.

Suit was brought by Ms. Green alleging that Dr. Lilliewood negligently failed to remove the IUD from her uterus when the tubal ligation was performed; and that this negligence proximately caused her to have continuous pain and suffering and to require additional medical treatment. The court granted Dr. Lilliewood's motion for a directed verdict on the ground that there was no evidence to support a reasonable inference that his negligence proximately caused Ms. Green's injuries. We disagree.

In considering whether respondent was entitled to a ▮ directed verdict, the evidence and all reasonable inferences therefrom must be viewed in the light most favorable to Ms. Green. *Bellamy v. G. M. A. C.,* 269 S. C. 578, 239 S. E. (2d) 73 (1977). Taken in this posture, we believe the evidence was sufficient to warrant submission of the case to the jury.

According to Ms. Green, Dr. Lilliewood admitted his negligence may have been responsible for her continuing discomfort and discharge. Ms. Green testified as follows:

"Mr. Kahn: . . . describe what happened in terms of your visit [to Dr. Lilliewood] over the next three or four years after the IUD was taken out? What did you do and what did he say to you?

"Ms. Green: Okay, all right. I would come up and I would tell him of my problems; the heavy discharge, the pain in the lower left area basically. There were times when I missed my period, and I told him about those things. At one point I asked him could the problems that I was having be related

to the IUD being retained; and he sort of looked embarrassed and nodded his head, but he didn't really tell me yes or no.

"Mr. Kahn: In what way did he nod his head?

"Ms. Green: Well . . . could be; could have been.

"Mr. Kahn: Was it affirmative or negative?

"Ms. Green: An affirmative." (Tr. pages 96 and 97).

In considering the propriety of the granting of respondent's motion for directed verdict, the alleged action of Dr. Lilliewood in nodding his head in response to appellant's question of whether her problems were related to the retention of the IUD must be taken as true. Such admissions by a defendant have been accorded high probative value tantamount to expert testimony in some cases. See *Robertson v. LaCroix,* 534 P. (2d) 17 (Okl. App. 1975) ; *Jarboe v. Harting,* 397 S. W. (2d) 775 (Ky. 1965) ; 70 C.J.S. Physicians and Surgeons § 62.

We do not think it was necessary that the alleged admission by Dr. Lilliewood meet the "most probably" standard of expert medical testimony established in *Armstrong v. Weiland,* 267 S. C. 12, 225 S. E. (2d) 851 (1976). In *Amstrong,* expert medical testimony was the *only* evidence presented to establish proximate cause. In this case, there was both expert medical testimony and circumstantial evidence from which the jury could have inferred negligence by Dr. Lilliewood.

This Court stated in *Gambrell v. Burleson,* 252 S. C. 98, 101, 165 S. E. (2d) 622, 623 (1969) :

"Where one relies upon medical testimony *alone* to show a causal connection between an injury and a subsequent condition, the testimony must meet the 'most probably' rule, and it is not sufficient that the malady in question 'possibly' or 'could have' or 'might have' resulted from the injury.

"Where the plaintiff does not, as here, rely *solely* on the opinion testimony of medical experts to establish the causal

connection, the aforementioned rule has not been strictly applied." (Emphasis supplied).

A valid reason for the "most probably" rule in cases ██ based solely on expert medical testimony is the highly technical nature of malpractice litigation. Since many malpractice suits involve ailments and treatments outside the realm of ordinary lay knowledge, expert testimony is generally necessary. When it is the only evidence of proximate cause relied upon it must provide a significant causal link between the alleged negligence and the plaintiff's injuries, rather than a tenuous and hypothetical connection.

However, where, as here, *both* expert testimony and circumstantial evidence of a physician's culpability are presented, the inquiry need only be whether there was sufficient competent evidence from which the jury may have inferred a causal connection. *Gambrell v. Burleson, supra;* 70 C.J.S. Physicians and Surgeons § 62, p. 1004.

The following testimony of Dr. Dennis, an expert witness called by Dr. Lilliewood, must also be considered:

"Q. . . . Was it a departure from good medical care Doctor for Dr. Lillewood not to remove that IUD at the time or around the time he did the tubal ligation?
"A. I would say that it was a departure from good medical care as I stated in my deposition." (Tr. p. 183).

This evidence that Dr. Lilliewood deviated from the customary standard of practice may have been sufficient in itself to raise a jury issue. According to 70 C.J.S. Physicians and Surgeons § 62, p. 1006:

"A departure from established standards of practice, unless justified by circumstances, often makes out a prima facie case of malpractice . . ."

Moreover, strong circumstantial evidence of respondent's negligence arises from the causal sequence of events. Soon after the insertion of the IUD, Ms. Green developed a vagi-

nal discharge, infection, cramping asd other associated problems. When these symptoms persisted, she decided to undergo a tubal ligation. Although she was under the impression the IUD was removed during this procedure, Ms. Green discovered over a year later that the IUD was still in her uterus.

██ In considering the sufficiency of circumstantial evidence, the facts and circumstances should be assessed in light of ordinary experience and common sense. Prosser, Law of Torts, p. 242 (1971); Dooley, Modern Tort Law, § 34. 108 (1977); *Barnwell v. Elliott, et al.,* 225 S. C. 62, 80 S. E. (2d) 748 (1954); *Chaney v. Burgess,* 246 S. C. 261, 266, 143 S. E. (2d) 521 (1965). This general proposition of tort law has been applied in medical malpractice cases as an exception to the general rule requiring expert medical testimony to establish proximate cause. As stated in *Jarboe v. Harting, supra,* 397 S. W. (2d) at 778:

"Admittedly, the general rule is that expert testimony is required in a malpractice case to show that the defendant failed to conform to the required standard, which is, such reasonable and ordinary knowledge, skill and diligence as physicians in similar neighborhoods and suroundings ordinarily use under like circumstances . . . However, . . . there is an *exception to the rule in situations where the common knowledge or experience of laymen is extensive enough to recognize or to infer negligence from the facts."* (Emphasis supplied).

Also see *Robertson v. LaCroix, supra; Scardina v. Colletti,* 63 Ill. App. (2d) 481, 211 N. E. (2d) 762 (1965); *Console v. Nickou,* 156 Conn. 268, 240 A. (2d) 895 (1968); Annotation, Proximate Cause in Malpractice Actions, 13 A.L.R. (2d) 11, 34.

It is a matter of common knowledge that a tubal ligation renders an IUD or any other birth control device useless. According to Dr. Dennis:

"[I]t's (the IUD's removal) usually customary because it was no longer necessary when she had her tubes tied." (Tr. p. 184).

Dr. Lilliewood's departure from the customary standard of care in failing to remove appellant's IUD and her subsequent injuries provides a temporal causal sequence which warrants a reasonable inference of respondent's negligence. When this circumstantial evidence is combined with the alleged admission by Dr. Lilliewood and the testimony of Dr. Dennis, a sufficient factual issue of causation is created. The case of *Grice v. Dickerson, Inc.*, 241 S. C. 225, 127 S. E. (2d) 722 (1962), though involving the sufficiency of evidence in a workmen's compensation context, is apposite. The Court stated:

"Here, reliance was not upon medical testimony alone to show causal connection between the injury and the subsequent disability of the claimant, but rather in addition upon the circumstances surrounding the injury and the events which followed . . . The uncertainty of the medical testimony was sufficiently supplied by the sequence of events which followed the injury." 241 S. C. at 230-231, 127 S. E. (2d) at 725.

Considering all the evidence in the light most favorable to Ms. Green, there was sufficient evidence of proximate cause to warrant its submission to the jury. Accordingly, we reverse the order granting respondent a directed verdict.

Reversed and remanded for a new trial.

LEWIS, C. J., and LITTLEJOHN, J., concur.

RHODES, J., concurs in result.

GREGORY, J., dissents.

GREGORY, Justice (dissenting) :

I respectfully dissent.

The majority opinion is directed toward establishing whether there was any evidence to support the reasonable inference that Dr. Lilliewood's failure to remove the IUD from Mrs. Green's uterus in July 1970 constituted negligence. However, that is not at issue. Dr. Lilliewood's negligence in failing to remove the IUD is admitted. Likewise, the existence of Mrs. Green's pain and suffering from July 1969 until September 1977 and the fact that she received subsequent medical treatment are not disputed.

The only issue presented by this appeal is whether there was any evidence to support the reasonable inference that Dr. Lilliewood's negligence was the proximate cause of Mrs. Green's injuries.

In a medical malpractice action it is incumbent on the plaintiff to establish proximate cause as well as the negligence of the physician. *Armstrong v. Weiland,* 267 S. C. 12, 225 S. E. (2d) 851 (1976). Negligence is not actionable unless it is a proximate cause of the injury complained of, and negligence may be deemed a proximate cause only when without such negligence the injury would not have occurred or could have been avoided. *Hughes v. Childrens Clinic, P.A.,* 269 S. C. 389, 237 S. E. (2d) 753 (1977); *Gunnells v. Roach,* 243 S. C. 248, 133 S. E. (2d) 757 (1963).

Dr. Lilliewood's failure to remove the IUD when requested resulted in the IUD remaining in Mrs. Green's uterus for thirteen (13) months longer than it would have remained there had he removed it. Mrs. Green claims that the presence of the IUD in her uterus for thirteen (13) additional months was the proximate cause of all her injuries. Stated another way, Mrs. Green claims that "but for" the presence of the IUD in her uterus for an additional thirteen (13) months she would have suffered no pain, and would have required no medical treatment.

The IUD was removed in September 1971 after three attempts on three separate days. The difficulty in removing

the IUD was caused by the IUD becoming implanted in the wall of Mrs. Green's uterus. Dr. Lilliewood's failure to remove the IUD when requested could be the proximate cause of the September 1971 treatment only if the IUD became implanted during the thirteen (13) month period following July 1970). If the IUD was already implanted in July 1970, Dr. Lilliewood's negligence would have been harmless. Mrs. Green offered no evidence on this point.

Mrs. Green also claims that the presence of the IUD in her uterus for the additional thirteen (13) months proximately caused the loss of uterus and right ovary. Even if we assume these injuries were caused by Mrs. Green's reaction to the IUD, there is no evidence that these injuries would not have occurred "but for" the presence of the IUD in Mrs. Green's uterus for the thirteen (13) additional months.

Finally, Mrs. Green claims that the presence of the IUD in her uterus for thirteen (13) additional months proximately caused her to suffer continuous pain. She testified, however, that she began to experience pain shortly after the IUD was inserted in July 1969, and that she continued to experience pain after the IUD was removed in September 1971. In fact, Mrs. Green' pain continued up to and including the time of her trial in September 1977, six years after the IUD was removed. Assuming this pain and suffering was caused by Mrs. Green's reaction to the IUD, there is no evidence that the pain and suffering would not have occurred "but for" the presence of the IUD in Mrs. Green's uterus for the thirteen (13) additional months.

The majority opinion recognizes that Dr. Lilliewood's affirmative nod of the head does not meet the "most probably" test for expert testimony set forth in *Armstrong v. Weiland, supra;* and its reliance on *Gambrell v. Burleson,* 252 S. C. 98, 165 S. E. (2d) 622 (1969) to overcome this defect is misplaced. The rule in *Gambrell, supra,* that medical testimony offered to show proximate cause need not meet

the "most probably" test where there is other evidence from which proximate cause can be inferred is inapplicable here since there is no other evidence in the record from which proximate cause can be inferred.

Dr. Dennis' testimony was directed to whether Dr. Lilliewood was negligent, not to whether Dr. Lilliewood's negligence was the proximate cause of Mrs. Green's injuries.

Neither may an inference of proximate cause arise from the temporal relation of negligence to injuries. The simple fact that Mrs. Green received medical treatment sometime after Dr. Lilliewood's negligence will not support a reasonable inference of proximate cause.

It should be noted again, although stated earlier, that Mrs. Green's pain and suffering began in July 1969, one year before Dr. Lilliewood's negligence in July 1970, existed during the thirteen (13) month period from July 1970 until September 1971 and continued thereafter up to and including the date of trial in September 1977.

I agree with the majority opinion that the only evidence introduced by Mrs. Green to establish proximate cause is her testimony regarding Dr. Lilliewood's affirmative nod of the head. Since the majority opinion concedes this testimony does not comply with the "most probably" rule, a jury could find proximate cause only through surmise, conjecture and speculation. Under established principles, this is impermissible.

As there was no evidence that would support the reasonable inference that Dr. Lilliewood's negligence was the proximate cause of Mrs. Green's injuries, the matter became one of law for the court and the trial judge correctly granted Dr. Lilliewood's motion for a directed verdict.

I would affirm.