**Robert A. DUMONT and Charleen A. Dumont, Plaintiffs,**

v.

**UNITED STATES of America, Defendant.**

No. 2:98–0119–11AJ.

United States District Court,
D. South Carolina,
Charleston Division.

Jan. 10, 2000.

A. Elliott Barrow, Jr., Charleston, SC, for plaintiffs.

Joseph P. Griffith, Jr., Asst. U.S. Attorney, Charleston, SC, for defendant.

### ORDER

CARR, United States Magistrate Judge.

This action brought under the Federal Tort Claims Act by Robert A Dumont (Dumont) and Charleen A. Dumont (Charleen Dumont) is before the undersigned United States Magistrate Judge on consent of the parties and an Order of reference from the court in accord with the provisions of 28 U.S.C. § 636(c).

A bench trial was held on October 15, 1999, and in accord with Rule 52 of the Federal Rules of Civil Procedure, the following findings of fact and conclusions of law are entered.

### Findings of Fact

The facts are largely undisputed and are adequately outlined in the government's pre-trial brief.

Robert Dumont (Dumont), a 71 year old veteran of the United States Navy and Army, was treated in 1990 at the Charleston Air Force Base Clinic for complaints of pain in his left knee, Ex. 3.11–11a, and was referred to the Charleston Naval Hospital (Naval Hospital), orthopedics section. Subsequently Dr. Slough, an orthopedic surgeon, diagnosed Dumont's problem as a probable degenerative meniscal tear of the left knee. Ex. 3.12. On March 19, 1990, at the Naval Hospital, Dr. Slough performed a diagnostic arthroscopy of Dumont's left knee, which included an arthroscopic synovial shaving, and Dr. Slough diagnosed Dumont's condition as degenerative joint disease of the left knee. Ex. 3.12–14. Dumont's prior consent for this surgery was obtained. Ex. 4.10, 27; Dumont Dep. pp. 2728. There are no allegations that this surgery was outside the applicable standard of care.

On July 30, 1990, Dr. Cushner performed a high tibia osteotomy (HTO) to Dumont's left knee at the Naval Hospital, which resulted in two surgical staples being stapled into Dumont's left proximal tibia bone. Ex. 3.16–25, 27, 31, 42–45; Ex. 5.5, 37–38, 42–43. Dumont's prior written consent for this surgery was obtained, and the proposed surgery on the consent form was described as "cut left tibia and remove wedge of bone and stabilize with metal staples." Ex. 5.53; Dumont Dep. p. 30. Prior to the surgery, Dr. Slough discussed the risks of surgery with Dumont, including anesthesia, bleeding, infection, nerve damage, numbness, non-union, mal-union, and the need for further surgery, and Dumont understood the risks and wished to proceed. Ex. 5.12. Dumont told the pre-operative nurse that the anticipated procedure was to "operate on my left knee and staple or do what is needed." Ex. 5.42. Dumont stated pre-operatively that he was experiencing numbness and aches/pains in his left knee. Ex. 5.70–73. There are no allegations that this surgery was outside the applicable standard of care.

On August 2, 1990, an x-ray showed Dumont's left knee post-HTO, and the joint spaces appeared maintained and the bones aligned. Ex. 5.48.

On August 23, 1990, an x-ray showed two metallic staples transfixing a previous osteotomy of the proximal lateral tibia of Dumont's left knee. Ex. 3.88.

On September 27, 1990, Dumont was in a cast, off crutches, and complaining of swelling and tenderness in his left knee. Ex. 3.23.

On October 1, 1990, an x-ray showed two metallic staples in the proximal lateral tibia of Dumont's left knee. Ex. 3.89.

On October 30, 1990, Dumont stated he had continued stiffness and pain in left knee. Ex. 3.22.

On November 27, 1990, Dumont complained of pain on the outside part of his left knee, and was referred to the physical

therapy department for range of motion exercises. Ex. 3.24.

On December 18, 1990, an x-ray showed two metallic staples in the proximal lateral tibia of Dumont's left knee, bony repair at the HTO site, and no change of position or alignment since the October 23, 1990 x-ray. Ex. 3.90.

On January 30, 1991 and February 8, 1991, Dumont had follow-up visits for his left knee. Ex. 3.25, 27. On April 3, 1991, follow-up evaluation revealed continued medial and lateral knee pain, but Dumont wanted to wait an additional four to six weeks before discussing possible arthroscopy of his left knee for suspected meniscal pathology. Ex. 3.130.

On May 2, 1991, an x-ray of Dumont's left knee revealed the two staples and the HTO healing, although mild degenerative changes were noted in all three compartments of the knee. Ex. 6.38.

On July 31, 1991, Dumont continued to have left knee pain post-HTO, with popping, locking and buckling of the knee, and possible meniscal tear, with x-ray indicating mild degenerative joint disease. Ex. 7.5. Dr. Turner planned a left knee arthroscopy. The surgical procedure was discussed with Dumont, including the risks of bleeding, infection and continued pain, and Dumont's questions were answered. Ex. 7.5.

On August 13, 1991, at the Naval Hospital, Dr. Turner performed a diagnostic arthroscopy of Dumont's left knee. Ex. 7.2, 23–25; 3.37–38. During the arthroscopy, the following significant observations were made regarding Dumont's left knee: a posterior medial meniscal tear, generalized adhesions throughout the knee with significantly decreased patellar mobility, three chronic anterior cruciate ligament tears and four grade IV chrondromalacia of the medial femoral condyle including weight bearing surface with grade III changes in the patella and medial facet of the patellar groove. Ex. 7.2, 23–25. A partial medial meniscectomy and debridement and resection of multiple adhesions were performed during the surgery. Ex. 7.2, 23–25. Du-mont's prior written consent for this surgery was obtained. Ex. 7.35; Dumont Dep. p. 31. Dumont reported to Navy nurses that it was his understanding that Dr. Turner would "do arthroscopy; if no success will need knee replacement." Ex. 7.49. This surgery was within the applicable standard of care.

On August 22, 1991, Dumont expressed a desire to undergo total knee arthroplasty (TKR) or knee replacement and wanted a follow-up with Dr. Slough. Ex. 3.40. On September 10, 1991, the risks of TKR surgery were discussed with Dumont, and he understood the risks and wished to proceed. Ex. 8.13.

On September 15, 1991, Dumont reported continued left knee pain and again requested a TKR. Ex 3.41.

On October 2, 1991, at the Naval Hospital, due to osteoarthritis/degenerative joint disease in Dumont's left knee, Dr. Slough performed a TKR of Dumont's left knee. Ex. 8.3–7, 88–92. Dumont's prior consent for this surgery was obtained. Ex. 8.115; Dumont Dep. p. 32. This surgery was within the applicable standard of care. Dumont did well in physical therapy and was discharged on October 12, 1991. Ex. 8.7.

On October 15, 1991, a pathology report showed specimens from Dumont's left knee were consistent with osteoarthritis. Ex. 8.88.

On November 5, 1991, an x-ray showed the TKR components as well situated, and the two staples imbedded in the tibia from the HTO. Ex. 3.116.

On November 26, 1991, an x-ray showed the TKR components as well situated and no changes were noted. Ex. 3.119.

On January 6, 1992, Dumont was fitted with a hinged knee brace for his left knee. Ex. 3.62.

On January 15, 1992, an x-ray showed the TKR components as well situated and no changes were noted, but Dumont was

still experiencing lateral left knee pain. Ex. 3.53, 122.

On April 15, 1992, Dumont reported lateral left knee pain and a "clunk" laterally which was possibly due to ligament laxity. Dr. Slough discussed options with Dumont, including the removal of the HTO staples if pain continued over the said staples. Ex. 3.54.

On June 19, 1992, a comparison x-ray showed that the TKR components were unchanged as were the two surgical staples in the lateral aspect of the left proximal tibia. Ex. 3.123.

On July 6, 1992, Dr. Flood had a long discussion with Dumont to schedule the removal of the retained staples hardware because the staples seemed to be the source of Dumont's lateral left knee pain. Ex. 3.56.

On July 28, 1992, Dumont signed a patient assessment report which stated, in part, "Reason For Admission/Chief Complaint: Left Knee Scope Staple Removal." Ex. 9.50. Dr. Flood's notes read "64 year old white male admit for arthroscopy left knee for hardware removal staples. Risks, complications discussed. Surgery explained. Questions answered." Ex. 9.11. Dumont's prior verbal and written consent for this surgery was obtained, and Dumont signed the consent form which stated, in part, "Operation or Procedure: Arthroscopy Left Knee With Removal Staples." Dumont Dep. p. 33; Ex. 9.41. The preoperative nurse's notes state, in part, that the "Patient states procedure is: 'Rem. staples left knee through scope.'" Ex. 9.35.

On July 29, 1992, at the Naval Hospital, Dr. Flood performed an arthroscopy of Dumont's left knee to attempt to remove two surgical staples previously placed in his left proximal tibia bone during the 1990 HTO procedure. Ex. 9.2, 30–32. During the surgery, the two staples were identified, and one staple was proud, but not loose. Ex. 9.31–32. During the surgery, Dr. Flood discovered that the correct surgical staple remover was not present in the operating room, and he determined to use

an instrument known as a bone hook to remove the staples. Ex. 9.32. During the attempt to remove the proud first staple with the bone hook, part of the first staple broke and remained imbedded in the bone. Ex. 9.32. The part of the first staple which remained imbedded in the bone was flush with the bone, not proud, and not loose. Ex. 9.32. Because of the difficulty attempting to remove the first staple and the fact that the proper instrumentation was not available, Dr. Flood made no attempt to remove the second staple. Ex. 9.32. The plaintiff was not advised of the failure to remove all of the staples.

On July 30, 1992, Dumont reported continued lateral knee pain. Ex. 9.5.

On September 17, 1992, Dumont reported continued lateral knee pain and was referred to MUSC orthopedic surgeon Dr. Shottey for a consultation. Ex. 3.61.

On October 13, 1992, Dumont reported continued left knee pain and stiffness, and that his knee was "loose." Ex. 12.3, 13.

On October 14, 1992, a left knee joint revision was planned. Ex. 12.8.

On October 15, 1992, at the Fort Gordon Army Medical Center (Army Hospital), an indium scan of Dumont's left knee was performed to detect signs of infection. The indium scan showed no infection in Dumont's left knee. Ex. 12.24.

On December 31, 1992, radiologists reported no active disease in Dumont's left knee. Ex. 11.73. His left knee was markedly swollen, he continued to have lateral knee pain, and Dumont could produce an audible clunking by shaking his left knee. Ex. 11.10–13.

On January 4, 1993, Dumont provided his medical history to Dr. Hartley. Dr. Hartley recorded that Dumont complained of "clunking" and a "giving way" sensation on uneven ground. Dr. Hartley's notes indicated that Dumont reported he underwent an arthroscopy four to six months ago which included removal of "part of one coverty staple." Dr. Hartley recorded that options, rehabilitation and potential

complications were fully discussed with Dumont, including infection, fracture, nerve injury, decreased motion and persistent pain. Dr. Hartley recorded the plan disclosed to Dumont was "staple removal and exploration of TKR" and that Dumont understood the "options and prognosis and wishe[d] to proceed." Ex. 11.18

On January 5, 1993, at the Army Hospital, Dr. Volgas performed surgery to Dumont's left knee which included a revision of his total left knee arthroplasty (revision of the tibial tray), a partial synovectomy, quadracep tendon repair and removal of the remaining non-broken staple in his left proximal tibia bone. Ex. 11.17, 18, 64–66. Dumont's prior written consent for this surgery was obtained, Ex. 11.76–78; Dumont Dep. p. 35, however, the consent does not mention the removal of the staples.

On March 22, 1993, May 27, 1993 and September 2, 1993, follow-up x-rays indicated Dumont's TKR prothesis to be well situated. Ex. 13.1–3.

On January 27, 1995, a Trident Regional Medical Center bone scan revealed activity in Dumont's left knee joint compatible with arthritis. Ex. 27.14.

On February 2, 1995, Dumont reported he enjoyed playing golf and had no functional limitations with the exception of ascending and descending stairs. Ex. 22.1–2.

On February 24, 1995, Dumont reported he was able to play golf two to three times per week and had no functional limitations. Ex. 27.30.

On November 7, 1995, Dumont injured his left knee, neck and back in an automobile accident. Dumont's civilian physicians apparently, mistakenly interpreted the broken staple in his tibia as being a broken saw blade. Ex. 20.12, 16–17. For sometime, the plaintiff suffered from the misconception that the partial staple was indeed a broken saw blade, and this action was commenced based on that misconception.

On November 15, 1995, Dumont reported golfing three to four times per week, with functional limitations caused by "neck and back pain." Ex. 27.23.

On November 16, 1995, Dr. Joseph J. Calandra, Dumont's civilian orthopedic surgeon, diagnosed Dumont's left knee swelling as due to degenerative changes to his patella. Ex. 28.14, 43.

On December 28, 1995, Dr. Calandra performed a patella revision of Dumont's left total knee replacement. Ex. 20.58–61. Prior to this surgery, Dumont's consent was obtained, the significance of the nature, alternatives, risks and consequences of the proposed surgery were explained, and Dumont wished to proceed. Ex. 28.13; Ex. 21.280, 320–321. Dr. Calandra did not attempt to remove the surgical staple part in Dumont's tibia because it was embedded in the bone tissue and would have been difficult to extract. Ex. 29.6–7.

The expert evidence of record is that, "what the surgeon did to remove the staples and his attempts to remove the staples was within the standard of care... I do not think that the hospital not having the appropriate equipment, was within the standard of care." Plaintiff's Ex. 21.27.

The plaintiff continues to have pain, cannot walk distances, cannot kneel, has trouble going up and down steps. He still plays golf, but uses a cart.

While the plaintiff underwent multiple surgeries to revise his knee replacement, there is no evidence that the cause of the knee replacement surgeries were the result of not having removed the staples completely. In fact, there is no evidence that the plaintiff underwent any unnecessary surgeries because of the failure to remove the staple completely. However, there is undisputed evidence that it was error to attempt to perform the surgery to remove the staples without the proper equipment available.

## Conclusions of Law

■ This court has proper subject matter jurisdiction of this action pursuant to 28 U.S.C. § 1346(b). The Federal Tort Claims Act directs this court to look to the law of the state where the act or omission occurred in order to determine whether a complaint in negligence warrants relief. *United States v. Muniz,* 374 U.S. 150, 83 S.Ct. 1850, 10 L.Ed.2d 805 (1963).

■ In this case, South Carolina law provides the appropriate standards. The burden of proof of negligence, proximate cause, and injury in a medical malpractice case is on the plaintiff throughout. In order to establish liability in a medical malpractice case, plaintiff must prove by a preponderance of the evidence the following:

(a) What the recognized and generally accepted standards, practices and procedures are in the community which would be exercised by competent physicians in the same specialty under similar circumstances.

(b) The physician or physicians and/or hospital personnel in question negligently deviated from the generally accepted standards, practices, and procedures.

(c) Such negligent deviation from the generally accepted standards, practices, and procedures was a proximate cause of the plaintiff's injury.

(d) The plaintiff was injured.

*Ellis v. United States,* 484 F.Supp. 4, 10–11 (D.S.C.1978), citing *Steeves v. United States,* 294 F.Supp. 446 (D.S.C.1968), *Price v. Neyland,* 320 F.2d 674 (D.C.Cir.1963), *e.g., Green v. Lilliewood,* 272 S.C. 186, 249 S.E.2d 910 (1978); *Burke v. Pearson,* 259 S.C. 288, 191 S.E.2d 721 (1972); *Bessinger v. DeLoach,* 230 S.C. 1, 94 S.E.2d 3 (1956).

■ Negligence may not be inferred from a bad surgical result or from a known risk of surgery which may occur. A physician or surgeon is not an insurer of health, and he is not required to guarantee results. He undertakes only to meet the standard of skill possessed generally by others practicing in his field under similar circumstances. *Stottlemire v. Cawood,* 213

F.Supp. 897 (D.D.C.1963); *Easterling v. Walton,* 208 Va. 214, 156 S.E.2d 787, 790 (1967); see *Fitzgerald v. Manning,* 679 F.2d 341 (4th Cir.1982). However, in this case, the expert evidence of record is that it was not within the standard of care and therefore was negligence for the hospital not to have the appropriate equipment for the staple removal surgery.

■ However, the plaintiff's case fails in that there is no evidence that the failure to have the proper equipment to remove the staples or leaving the broken staple in place was the proximate cause of any injury suffered by the plaintiff. Proof of a causal connection must be something more than evidence consistent with the plaintiff's theory of how the claimed injury was caused; proof of causation cannot rest on conjecture, and the mere possibility of such causation is not enough to sustain plaintiff's burden of proof. *Walstad v. University of Minnesota Hospitals,* 442 F.2d 634 (8th Cir.1971). *Res ipsa loquitur* is not a legal doctrine recognized in South Carolina. *McLain v. Carolina Power & Light Co.,* 286 F.2d 816 (4th Cir.1961). The proof presented here leaves it equally probable that the source of the plaintiff's continued pain may have been due to a cause other than the partial staple or some other cause for which the defendant was or was not responsible. Therefore, recovery for Dumont based on malpractice cannot be had. *Fitzgerald v. Manning,* 679 F.2d 341 (4th Cir.1982); *Watkins v. United States,* 589 F.2d 214 (5th Cir.1979); *Eckert v. United States,* C/A No. 76–2406–1 (D.S.C., Jan. 17, 1980).

The defendant in this case cannot be held responsible. **THEREFORE, IT IS ORDERED,** that this action be, and the same is hereby, dismissed.

**IT IS SO ORDERED.**