# THE STATE OF SOUTH CAROLINA
## In The Court of Appeals

Jackie Eadon Chalfant, Individually and as a Personal Representative of the Estate of Michael Dallas Chalfant, Appellant,

v.

Carolinas Dermatology Group, P.A., a South Carolina Professional Association, and Mark G. Blaskis, M.D., Individually, Respondents.

Appellate Case No. 2019-001145

———————

Appeal From Richland County
R. Keith Kelly, Circuit Court Judge

———————

Opinion No. 5977
Heard June 15, 2022 – Filed April 12, 2023

———————

## AFFIRMED IN PART, REVERSED IN PART, AND REMANDED

———————

William T. Geddings, Jr., of Geddings Law Firm, PA, of Manning, and Michael G. Fink, of Fort Myers, Florida, both for Appellant.

Brandon Robert Gottschall, of Sweeny Wingate & Barrow, PA, of Columbia, and Martin S. Driggers, Jr., of Driggers Law Firm, of Hartsville, both for Respondents.

———————

**LOCKEMY, A.J.:** In this medical malpractice action, Jackie Eadon Chalfant (Appellant) appeals the trial court's grant of a directed verdict in favor of Carolinas

Dermatology Group, P.A. (CDG) and Dr. Mark G. Blaskis (collectively, Respondents).  Appellant argues (1) expert witness testimony was unnecessary because the common knowledge exception applied to Respondents' failure to provide after-hours contact information and post-operative instructions to her husband, Michael Dallas Chalfant (Decedent); (2) the record contained conflicting testimony as to whether Respondents breached the standard of care in providing post-operative instructions; and (3) expert witness testimony created a question of fact as to whether the Decedent's tachycardia was a contraindication to performing surgery on May 12, 2015, without proper cardiac follow-up.  We affirm in part, reverse in part, and remand.

## FACTS/PROCEDURAL HISTORY

On March 31, 2015, Dr. Peter J. Stahl, who was Decedent's primary care physician, referred Decedent to CDG for a consultation regarding skin cancer on his left ear and forehead.  Dr. Stahl indicated that at the time of the visit, Decedent was seventy-four years old, weighed 103 pounds, and measured five feet, eight inches.  Dr. Stahl also listed Decedent's pulse as 120 beats per minute (bpm) on the referral form.

On May 12, 2015, Decedent completed a surgery consent form which authorized Dr. Blaskis to treat the basal cell carcinoma on his left ear and left cheek with Mohs micrographic surgery.  The consent form articulated the risks involved with surgery, including bleeding, infection, scarring, nerve damage, incomplete removal, recurrence, and pain.  The same day, Dr. Blaskis performed Mohs surgery on Decedent.  Following surgery, the medical report stated: "After a discussion of the risks of bleeding, scarring, infection, pain, and wound dehiscence, informed consent was obtained and the defect was referred to Dr. Brett Carlin for repair.  Verbal wound care instructions, with written handout, were given."  Dr. Blaskis's paper discharge instructions instructed a patient to leave the pressure bandage on for forty-eight hours and to call "(803) 771-7506 ext. 209" with questions.

Unfortunately, Decedent passed away on May 13, 2015.  According to Decedent's death certificate, his primary cause of death was exsanguination and hemorrhage from his left ear surgical site.  The death certificate also listed chronic obstructive pulmonary disease and coronary artery disease as other significant conditions.

In January 2017, Appellant, individually and as personal representative of Decedent's estate, filed a complaint against Dr. Blaskis and CDG, alleging medical malpractice, wrongful death, ordinary negligence, and gross negligence.

At trial in 2019, Appellant testified she remained present with Decedent during the entirety of his office visit with Dr. Blaskis.  She stated Dr. Blaskis never mentioned the risk of bleeding after surgery and that "[t]he only place [she] saw the word bleeding at all was on the consent form [Decedent] signed before the surgery."  Appellant denied Dr. Blaskis ever said anything to them about calling 911 or going to the emergency room (ER) if there was bleeding after surgery.  She indicated they were only told not to remove the pressure bandage on Decedent's ear.

According to Appellant, she and Decedent left Dr. Blaskis's office around 4:00 p.m.  She recalled that when they got home from the surgery, Decedent poured himself a glass of vodka and cranberry juice, which he drank over the course of the evening.  Appellant stated Dr. Blaskis did not advise Decedent to avoid drinking alcohol or that it would increase the risk of bleeding.  She indicated she noticed "blood oozing from underneath [Decedent's] bandage" around 7:00 p.m. and gave him some paper towels.  Appellant testified she then looked at the post-op instructions sheet and called the number on the sheet due to her concerns.  She stated she dialed the number and the first prompt said "if this is a true emergency, hang up, [and] dial 911" but she did not believe the situation was a true emergency.  Appellant explained the next prompt directed her, "if you know your party's extension, dial it now," and she entered the extension listed on the instructions sheet.  She testified that because she entered the extension, she did not hear the rest of the message prompt, as detailed below.

Appellant submitted CDG's after-hours phone message on the date of Decedent's death as an exhibit.  The prompt read:

> You have reached Carolinas Dermatology After-Hours.
> If this is a true emergency, please hang up now and call
> 911.  If you know your party's extension you may dial it
> now.  To hear our automated options, press 1.  For a
> prescription refill or to leave a message to be returned on
> the next business day, please press 2.  For all other
> serious medical concerns, dial 9 now for our answering
> service.  To hear these options again, press the * key.

Appellant stated she left a message but never received a call back and "assumed that it must not be an emergency if they didn't immediately call me back."

According to Appellant, as they ate dinner and watched television, Decedent continued to dab the blood with paper towels.  She explained she "suggested that [they] should go to the [ER] and have it checked out" but Decedent refused to go.

Appellant recalled a conversation with a friend named Bob, and Bob also suggested they go to the emergency room; however, Decedent refused. Appellant further indicated that if Dr. Blaskis had said to go to the ER if there was bleeding, Decedent "would certainly have done what the doctor said."

Appellant testified Decedent changed his shirt before bed because there was blood on his collar and t-shirt, and she placed a towel over his pillow before they went to bed. She recalled Decedent awoke at 3:30 a.m., sat on the side of the bed, used his inhaler, and then laid back down. Appellant stated she heard Decedent get up and walk to the bathroom around 4:30 a.m., where she found him sitting on the toilet. According to Appellant, she asked if he was okay, and he requested she bring his inhaler. She indicated that when she re-entered the bedroom and turned on the lights, she saw a large amount of coagulated blood on the pillow. Appellant explained she then heard something fall in the bathroom and returned to find Decedent slumped against the wall. Appellant testified the paramedics arrived at 5:51 a.m. to transport Decedent to the hospital; unfortunately, medical personnel were unable to revive him.

On cross-examination, Appellant testified she did not know there were more prompts on the after-hours message after the prompt to enter a party's extension. She further acknowledged she never tried to dial the number again.

Dr. Blaskis testified he only provided patients with one page of discharge instructions after completing surgery because he had been trained to give extensive verbal post-operative instructions. He maintained, "I've never had a patient in 20,000 patients I've treated, nobody has left my office without . . . having heard about post[-]op bleeding at least half a dozen times." Dr. Blaskis recalled Appellant and Decedent "were told extensively to call me if there was bleeding." He then stated that "the standard of care is . . . verbal instructions are as good as written."

Dr. Blaskis acknowledged he would have been able to save Decedent if Decedent had contacted him on the night of surgery. However, Dr. Blaskis further acknowledged he knew that when patients dialed extension 209, the call would go to his medical assistant's desk, not an answering service, but if a patient listened to the entire message prompt, he could reach the answering service. He indicated all of the doctors and partners of the practice approved the outgoing message and forms used in this case. Dr. Blaksis further stated another doctor who conducted Mohs surgery at his practice, Dr. Long Quan, gave patients his cellphone number.

Dr. Blaskis also testified that although Decedent's heartrate was 116 bpm on the day of surgery, he "felt very comfortable with" Decedent's primary care physician's assessment and referral for surgery with a heartrate of 120 bpm.

Prior to trial, Respondents completed an interrogatory indicating Debbie Clarke and Ashley Grant "had the duty or responsibility to establish and implement polic[]ies, procedures, rules, standing orders and/or protocols which [CDG] had in place regarding the recognition, management and prevention of post-operative complications on or about May 12, 2015." However, Clarke later testified she was not responsible for the forms used with regard to the care given to Decedent.

Dr. Jing Zhang, the president of CDG, also testified at trial that Clarke and Grant—CDG's practice manager and office manager, respectively—had no medical training. He explained they were responsible for ensuring "all the policies [were] fulfilled to the criteria of the law[]" but were not responsible for ensuring the standard of care. Dr. Zhang indicated that, "For each medical procedure[], it's up to each individual doctor" and "their training and the medical board govern[s] . . . what is the standard of care." He further stated CDG's doctors develop their own forms and materials provided to patients based on different training and subspecialties.

Dr. Pearon Lang, who was qualified as an expert witness for Respondents, testified bleeding was a major concern in the first twenty-four hours after surgery, and his post-op form addressed what to do about bleeding. He indicated that if a surgeon failed to discuss any unique risks a particular patient presented with based on their condition, then that failure would fall below the standard of care. According to Dr. Lang, after reviewing Decedent's complete medical charts and exhibits in the case, he did not believe Dr. Blaskis breached any standard of care. Dr. Lang indicated the risks of the procedure were clearly outlined in the consent form Decedent signed prior to surgery, and it was within the standard of care to give discharge instructions verbally. He further testified he expected a patient to call 911 or go to the ER if unable to reach the doctor.

Regarding CDG's after-hours phone message, Dr. Lang acknowledged, "it would be ideal if [the after-hours phone number] went straight to an answering service," but stated if there was "some sort of message system set up so that eventually the patient will get to the answering service," the message would be acceptable. Dr. Lang further opined Dr. Blaskis's phone prompt "was a very good message . . . easy to follow." He recalled the after-hours telephone number at his office went immediately to an answering service.

Dr. Lang opined Decedent's 116 bpm heartrate on the day of surgery would be considered tachycardia. When questioned whether tachycardia would be a contraindication to performing Mohs surgery, Dr. Lang replied, "[Y]ou need to look at the big picture" and explained Decedent's heartrate at 116 bpm "was baseline for him." He further opined Decedent was a suitable candidate for Mohs surgery and it was within the standard of care to proceed when his referral heartrate showed 120 bpm. Appellant then cross-examined Dr. Lang with his deposition testimony, in which he stated he would have sent Decedent for an assessment before performing surgery. Dr. Lang explained he changed his opinion after reviewing both the referral form and the primary care records from Dr. Stahl, indicating "the risks [we]re minimal." He explained that although the surgery could have been postponed for further assessment, it was unnecessary.

Dr. Sean Christensen, who was also qualified as an expert in Mohs surgery and dermatology, agreed it was within the standard of care to give verbal post-operative instructions. He further opined that Dr. Blaskis performed Decedent's Mohs surgery within the standard of care. However, Dr. Christensen explained that if a doctor failed to discuss with a patient all known risks and complications of the proposed surgery, then that would fall below the standard of care. He stated a doctor was also responsible "to tell the patient what to do if they have any of the potentially expected complications including bleeding . . . ." Dr. Christensen explained his concern that Dr. Blaskis's discharge instructions did not adequately educate a patient what to do about bleeding. He stated that although Dr. Blaskis said he educated Decedent, Dr. Blaskis had not "documented in the medical record."

Dr. Christensen testified he believed Dr. Blaskis's instructions as to how to get in touch with his office were inconsistent and confusing. He stated the extension would not help a patient on the night of surgery "[b]ecause [the message prompt] clearly says if you know your party's extension, dial it now, and [Dr. Christensen thought] that most people in that situation would dial it now if they were given an extension by the surgeon who performed the surgery." He was asked whether dialing the extension was "common sense," and he replied it was. Dr. Christensen testified patients were directed immediately to the on-call doctor at his office. He acknowledged he expected a patient who experienced bleeding like Decedent would call 911 or go to ER if they could not get in touch with the doctor. Dr. Christensen opined that stopping Decedent's bleeding would have saved his life.

Dr. Christensen further testified he would have been concerned regarding Decedent's elevated heartrate and it was unclear whether Dr. Blaskis adequately assessed the heartrate. However, he acknowledged he may have gone forward

with the Mohs surgery on Decedent after obtaining additional information as to whether Decedent's heartrate constituted a medically concerning condition. However, he stated that if a doctor failed to provide his patient with a thorough examination before surgery, then the doctor's actions would fall below the standard of care.

Dr. Amy Durso testified she conducted an autopsy on Decedent and explained his cause of death was blood loss due to hemorrhage from the left ear surgical site with contributing factors to include "chronic obstructive pulmonary disease, coronary disease, and adult failure to thrive." Dr. Durso explained Decedent lost enough blood on the night of his death to fill "two cans of Coke and maybe three."

At the close of Appellant's case, Respondents moved for a directed verdict, arguing Appellant failed to prove a breach of the standard of care and causation. In response, Appellant requested to amend her complaint to conform to the evidence and include the common knowledge exception. Respondents replied the discharge instructions sheet was prepared and approved by doctors; thus, expert testimony was necessary to prove a breach of the standard of care.

The trial court denied Appellant's request to amend her complaint and granted Respondents' motion for a directed verdict, finding there was no evidence upon which a reasonable jury could conclude the alleged negligent act or omissions from Dr. Blaskis proximately caused Decedent's death. This appeal followed.

## ISSUES ON APPEAL

1. Did the trial court err in granting a directed verdict against Appellant for failure to establish all elements of medical malpractice claims by expert witness testimony when the common knowledge exception was applicable because the evidence introduced at trial established Respondents' failure to provide Decedent with after-hours contact information and post-surgery instructions?

2. Did the trial court err in granting a directed verdict against Appellant as there existed conflicting testimony regarding a breach of the standard of care related to post-surgery instructions?

3. Did the trial court err in granting a directed verdict against Appellant when conflicting testimony by Respondents' expert witness created a question of fact regarding a breach as to the standard of care when the Respondents' expert testified he would not have operated on Decedent because his tachycardia was a

contraindication to performing surgery on May 12, 2015, without proper cardiac follow-up?

## STANDARD OF REVIEW

"A directed verdict should be granted where the evidence raises no issue for the jury as to the defendant's liability." *Guffey v. Columbia/Colleton Reg'l Hosp., Inc.*, 364 S.C. 158, 163, 612 S.E.2d 695, 697 (2005). "When reviewing a directed verdict, [the appellate] court will view the evidence and all reasonable inferences in the light most favorable to the nonmoving party." *Thomas v. Dootson*, 377 S.C. 293, 296, 659 S.E.2d 253, 255 (Ct. App. 2008). "This court will reverse the circuit court's ruling on a directed verdict motion only when there is no evidence to support the ruling or when the ruling is controlled by an error of law." *Turner v. Med. Univ. of S.C.*, 430 S.C. 569, 582, 846 S.E.2d 1, 7 (Ct. App. 2020).

## LAW/ANALYSIS

### I. Common Knowledge Exception

First, we observe Appellant was not required to plead the common knowledge exception in her complaint because the exception is encompassed as an element of a medical malpractice claim. *See Pederson v. Gould*, 288 S.C. 141, 143, 341 S.E.2d 633, 634 (1986) ("In medical malpractice actions, the plaintiff must use expert testimony to establish both the required standard of care and the defendant's failure to conform to that standard, *unless the subject matter lies within the ambit of common knowledge and experience*, so that no special learning is needed to evaluate the conduct of the defendant." (emphasis added)).

Second, Appellant argues the trial court erred by granting a directed verdict because the common knowledge exception was applicable, and the evidence established Respondents failed to provide Decedent with after-hours contact information and post-surgery instructions. She asserts that in society today, it is commonplace to interact with automated telephone prompts and most individuals will dial the extension when instructed to do so rather than listen to the message in its entirety. Thus, Appellant contends whether Respondents committed medical malpractice by providing a discharge form with instructions to dial an extension lies within the ambit of common knowledge. We disagree.

"[O]ur [s]upreme [c]ourt has held that in any 'area beyond the realm of ordinary lay knowledge, expert testimony will usually be necessary to establish both the standard of care and the defendant's departure therefrom.'" *Hook v. Rothstein*, 281 S.C. 541, 551, 316 S.E.2d 690, 697 (Ct. App. 1984) (quoting *Kemmerlin v.*

*Wingate*, 274 S.C. 62, 65, 261 S.E.2d 50, 51 (1979)). "When expert testimony is not required, the plaintiff must offer evidence that rises above mere speculation or conjecture." *Hickman v. Sexton Dental Clinic, P.A.*, 295 S.C. 164, 168, 367 S.E.2d 453, 455 (Ct. App. 1988). "The application of the common knowledge exception in proving negligence in a case involving medical malpractice depends on the particular facts of the case." *Brouwer v. Sisters of Charity Providence Hosps.*, 409 S.C. 514, 521, 763 S.E.2d 200, 203-04 (2014) (quoting *Hickman*, 295 S.C. at 168, 367 S.E.2d at 455). "Ultimately, due to the fact-specific nature of the determination, it is a question that must be left within the discretion of the trial judge." *Babb v. Lee Cty. Landfill SC, LLC*, 405 S.C. 129, 154, 747 S.E.2d 468, 481 (2013).

Several courts have addressed the applicability of the common knowledge exception. *Compare Brouwer*, 409 S.C. at 522, 763 S.E.2d at 204 (finding that the "negligent exposure of a patient to latex with a known allergy can result in an allergic reaction in that patient" was a matter within common knowledge); *Green v. Lilliewood*, 272 S.C. 186, 192, 249 S.E.2d 910, 913 (1978) (holding it was a matter of common knowledge that a tubal ligation renders an intrauterine device or any other birth control device useless); *Dootson*, 377 S.C. at 296, 659 S.E.2d at 255 (holding a claim arising from a surgical drill that burns skin on contact falls within common knowledge or experience of laymen), *with Pederson*, 288 S.C. at 143, 341 S.E.2d at 634 (finding damage to the ureter during a hysterectomy did not fall in common knowledge exception); *Melton v. Medtronic, Inc.*, 389 S.C. 641, 665, 698 S.E.2d 886, 899 (Ct. App. 2010) (holding whether something so complex as an implanted cardioverter defibrillator was operating properly was not common knowledge); *Carver v. Med. Soc'y. of S.C.*, 286 S.C. 347, 350, 334 S.E.2d 125, 127 (Ct. App. 1985) (explaining that "the use of an electrosurgery machine during open-heart surgery and the procedures medical personnel should follow when the machine is in operation are not matters within the ambit of common knowledge or experience"); *Gass v. Haines*, 298 S.C. 549, 551, 381 S.E.2d 923, 925 (Ct. App. 1989) (finding the treatment of glass puncture wounds was not in the common knowledge of a jury).

We hold the trial court properly granted a directed verdict as to the one-page telephone discharge instructions and the phone prompt because no expert testified Dr. Blaskis or CDG breached the standard of care. *See Babb*, 405 S.C. at 154, 747 S.E.2d at 481 ("Ultimately, due to the fact-specific nature of the determination, it is a question that must be left within the discretion of the trial judge."); *Pederson*, 288 S.C. at 143, 341 S.E.2d at 634 ("In medical malpractice actions, the plaintiff must use expert testimony to establish both the required standard of care and the

defendant's failure to conform to that standard, unless the subject matter lies within the ambit of common knowledge and experience, so that no special learning is needed to evaluate the conduct of the defendant.").  Additionally, we find the standard of care and breaching the standard of care did not lie within the ambit of common knowledge.  Multiple doctors testified as to their differing uses of discharge instructions and phone prompt systems, which made the necessity of expert testimony more likely to aid the jury in determining the standard of care and a breach of that standard of care.  Regarding the discharge instructions, Dr. Zhang testified CDG's doctors developed their own materials they provided to patients based on different trainings.  As to the phone prompt system, Dr. Quan gave his patients his cellphone number in case of an emergency, Dr. Lang testified his office's prompt went directly to an answering service, and Dr. Christensen testified his after-hour calls were directed immediately to the on-call physician.  Thus, we believe the trial court properly granted a directed verdict on these issues.

## II.     Breach of Standard of Care and Post-Surgery Instructions

Appellant argues the trial court erred by granting a directed verdict to Respondents because there existed conflicting testimony regarding the breach of the standard of care related to post-surgery instructions.  She asserts several experts testified that the standard of care required discussing the risks associated with surgery, including bleeding, before, during, and after surgery.  Appellant contends a question of fact requiring submission to the jury was created because she testified Dr. Blaskis failed to provide Decedent with post-operative instructions related to bleeding, in contradiction to Dr. Blaskis's testimony.  She also avers that Dr. Christensen was not able to testify that Dr. Blaskis breached the standard of care because he could not definitively state whether Dr. Blaskis gave verbal instructions.  Appellant further argues Dr. Blaskis's actions proximately caused Decedent's death because experts testified at trial that if Decedent had been able to communicate with Dr. Blaskis, his bleeding could have been stopped.  She contends "circumstantial evidence that is within the common knowledge of the jury based on the sequence of events" could also prove proximate cause.  We agree.

> A plaintiff alleging medical malpractice must provide evidence showing: (1) the generally recognized and accepted practices and procedures that would be followed by the average, competent physician in the defendant's field of medicine under the same or similar circumstances, and (2) the defendant departed from the recognized and generally accepted standards.

*Hoard ex rel. Hoard v. Roper Hosp., Inc.*, 387 S.C. 539, 546, 694 S.E.2d 1, 4 (2010). "Expert testimony is required to establish the duty owed to the patient and the breach of that duty in medical malpractice claims unless the subject matter of the claim falls within a layman's common knowledge or experience." *Turner*, 430 S.C. at 583-84, 846 S.E.2d at 8.

"In a medical malpractice action, the plaintiff must establish proximate cause as well as the negligence of the physician." *Fletcher v. Med. Univ. of S.C.*, 390 S.C. 458, 462, 702 S.E.2d 372, 374 (Ct. App. 2010) (quoting *Guffey*, 364 S.C. at 163, 612 S.E.2d at 697). "Generally, expert testimony is required to establish proximate cause in a medical malpractice case." *Bramlette v. Charter-Med.-Columbia*, 302 S.C. 68, 72, 393 S.E.2d 914, 916 (1990).

Viewing the facts in the light most favorable to Appellant, we hold the trial court erred in granting a directed verdict on this issue because it was not within the court's authority to resolve conflicts in the testimony presented at trial. *See Dootson*, 377 S.C. at 296, 659 S.E.2d at 255 ("When reviewing a directed verdict, [the appellate] court will view the evidence and all reasonable inferences in the light most favorable to the nonmoving party."); *Turner*, 430 S.C. at 582, 846 S.E.2d at 7 ("This court will reverse the circuit court's ruling on a directed verdict motion only when there is no evidence to support the ruling or when the ruling is controlled by an error of law."). Regarding the standard of care, Dr. Christensen—a qualified expert—testified a doctor was responsible "to tell the patient what to do if they have any of the potentially expected complications including bleeding . . . ." However, as to breaching the duty, Dr. Christensen explained he could not testify Dr. Blaskis breached his duty because it was unclear whether Dr. Blaskis verbally explained the possible complications as "[i]t was not documented in the medical record." Although Dr. Blaskis testified Appellant and Decedent "were told extensively to call me if there was bleeding," Appellant repeatedly refuted this testimony. As a result, a conflict in trial testimony existed which required submission to the jury. *See Dootson*, 377 S.C. at 297, 659 S.E.2d at 255 ("When considering directed verdict and JNOV motions, neither the trial court nor the appellate court has authority to decide credibility issues or to resolve conflicts in the testimony or evidence." (quoting *Welch v. Epstein*, 342 S.C. 279, 300, 536 S.E.2d 408, 419 (Ct. App. 2000))).

In *Stallings v. Ratliff*, 292 S.C. 349, 356 S.E.2d 414 (Ct. App. 1987), Stallings testified at trial that Dr. Ratliff failed to inform her that there was a risk of a perforated esophagus prior to obtaining consent to perform an esophagoscopy. *Id.* at 353, 356 S.E.2d at 416. However, Dr. Ratliff testified he did inform Stallings specifically of the risk of sustaining a perforated esophagus. *Id.* In reversing the

grant of a directed verdict, our court explained, "Based on the expert testimony as to standard of care, it was assuredly within the competence of the jury to draw the inference that if [Dr.] Ratliff's testimony was correct there had been no breach of duty, while if Stallings was correct there had been a breach of duty." *Id.* at 354, 356 S.E.2d at 417. As such, it presented a simple "question of who was telling the truth" and "a classic jury issue was presented." *Id.* Similarly, we hold whether or not Dr. Blaskis breached the standard of care by failing to educate Decedent properly was a jury question as to who was telling the truth, Appellant or Dr. Blaskis. Even though Dr. Christensen could not explicitly testify Dr. Blaskis breached the standard of care, he did testify it was a doctor's responsibility to give instructions to the patient regarding bleeding. Moreover, the "breach of duty does not turn on a ritual incantation of certain magic words by an expert witness." *Id.* at 353, 356 S.E.2d at 417.

Additionally, there was enough evidence in the record to submit the issue of proximate cause to the jury. Appellant testified that if Dr. Blaskis had instructed them to go to the ER if bleeding, Decedent "would certainly have done what the doctor said." Both Dr. Blaskis and Dr. Christensen testified that if Decedent had stopped the bleeding, his life would have been saved. Finally, Dr. Durso testified Decedent's blood loss due to hemorrhage from the left ear surgical site caused his death. Therefore, a jury could have reasonably inferred a causal connection between Dr. Blaskis's alleged failure to warn Decedent regarding the risks of bleeding and his subsequent death by exsanguination. *See Lilliewood*, 272 S.C. at 191, 249 S.E.2d at 912 ("However, where, as here, [b]oth expert testimony and circumstantial evidence of a physician's culpability are presented, the inquiry need only be whether there was sufficient competent evidence from which the jury may have inferred a causal connection.").

### III. Breach of Standard of Care and Tachycardia

Appellant argues the trial court erred by granting a directed verdict because there was conflicting testimony from Respondents' expert witness resulting in a question of fact regarding Decedent's tachycardia. She contends that in viewing Dr. Lang's testimony in the light most favorable to her, she presented sufficient expert testimony to warrant submission to the jury. We disagree.

We hold the trial court properly granted a directed verdict in favor of Respondents on this issue because Appellant failed to present expert testimony to establish Dr. Blaskis breached the duty of care by proceeding with surgery despite Decedent's tachycardia. *See Fletcher*, 390 S.C. at 462, 702 S.E.2d at 374 ("On review, an appellate court will affirm the granting of a directed verdict in favor of the

defendant when there is no evidence on any one element of the alleged cause of action."); *Dawkins v. Union Hosp. Dist.*, 408 S.C. 171, 176, 758 S.E.2d 501, 504 (2014) (providing expert testimony is required to establish duty and breach of duty in medical malpractice cases); *Brouwer*, 409 S.C. at 521, 763 S.E.2d at 203 (finding that to establish an action for medical malpractice, a plaintiff must establish the "[r]ecognized and generally accepted standards, practices, and procedures which are exercised by competent physicians in the same branch of medicine under similar circumstances" (quoting 27 S.C. Jur. *Med & Health Prof'ls* § 10 (2014))).

Here, Dr. Lang testified that after reviewing the complete medical chart from Decedent's primary care physician, he did not believe Dr. Blaskis breached any standard of care. He also stated he believed Decedent was a suitable candidate for Mohs surgery, and it was within the standard of care to proceed when his referral heart rate was 120 bpm. When cross-examined with his deposition testimony, Dr. Lang explained he had not previously reviewed Decedent's prior medical records and, because Decedent's heartrate was normally elevated, the risks of proceeding with surgery at his baseline heartrate were minimal. Moreover, Dr. Christensen, Appellant 's own expert witness, failed to testify Dr. Blaskis breached the standard of care by proceeding with surgery. Thus, there was no conflicting testimony in the record warranting submission to the jury.

We further find there was no evidence presented Dr. Blaskis proximately caused Decedent's death by proceeding with surgery despite his tachycardia because all of the doctors who testified at trial indicated they may have moved forward with Decedent's surgery with his heartrate at baseline. *See Fletcher*, 390 S.C. at 463, 702 S.E.2d at 374 (explaining that in a medical malpractice action, "the plaintiff must present evidence that the defendant's failure to adhere to the standard of care proximately caused the complained[-]of injury"). Therefore, the trial court did not err by granting a directed verdict on this issue.

**CONCLUSION**

Based on the foregoing, we affirm the trial court's granting of a directed verdict on the issues as to CDG's phone prompt, Dr. Blaksis's one-page discharge instructions, and proceeding with surgery despite Decedent's tachycardia. However, we reverse the trial court's grant of a directed verdict on Dr. Blaskis's post-surgical instructions on bleeding.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

**GEATHERS, J., concurs.**

**HILL, A.J., concurring in a separate opinion:**

I concur in the majority opinion but write separately to express my view that the decedent's inaction in response to his active, extensive bleeding may well have exceeded the alleged negligence of Dr. Blaskis. But that is a factual issue that we, except in rare cases, leave to the jury to decide. *Bloom v. Ravoira*, 339 S.C. 417, 422, 529 S.E.2d 710, 713 (2000). This unfortunate case is almost–but not quite– such a rarity.