389 S.C. 641 (2010)
698 S.E.2d 886
William P. MELTON and Ann Frazier Melton, Appellants,
v.
MEDTRONIC, INC., Dr. Jennifer Feldman, and Columbia Heart Clinic P.A., d/b/a Columbia Heart and/or Columbia Heart Cardiologists, Defendants,
Of whom Dr. Jennifer Feldman, and Columbia Heart Clinic P.A., d/b/a Columbia Heart and/or Columbia Heart Cardiologists are Respondents.
No. 4729.
Court of Appeals of South Carolina.
Heard April 14, 2010.
Decided August 25, 2010.
*647 Glenn E. Bowens, of Winnsboro, for Appellants.
Martin S. Driggers, Jr., of Hartsville, for Respondents.
WILLIAMS, J.
In this civil case, we must determine whether the circuit court erred in granting summary judgment in favor of Dr. Jennifer Feldman (Dr. Feldman) and Columbia Heart Clinic (collectively Respondents) on William and Ann Melton's (collectively Appellants) causes of action for medical malpractice, negligent misrepresentation, abandonment, and intentional infliction of emotional distress.[1] We affirm.

FACTS
William Melton (Melton) is a seventy-four-year-old male who resides in Winnsboro, South Carolina. In 2002, Melton had what he described as a "flicker of a blackout," which caused him to become unsteady when he stood up. Following this episode, Melton visited his family physician, Dr. Manuel Venegas (Dr. Venegas), in Chapin, South Carolina. After putting Melton through a series of tests, Dr. Venegas concluded Melton did not have a serious heart problem. However, as a safety precaution, Dr. Venegas referred Melton to Dr. Feldman, a cardiologist in Columbia, for further assessment.
Dr. Feldman arranged for Melton to have a catheterization performed on June 24, 2002. Before the catheterization, Melton was given a form to sign that would authorize Dr. Feldman to implant a cardioverter defibrillator (ICD) into *648 Melton's heart if necessary. Although Melton does not recall being told exactly what an ICD would do or whether he actually needed one, he signed the form.
After the catheterization, Dr. Feldman informed Melton he needed to have an ICD implanted. Dr. Feldman recommended an ICD made by Medtronic, Inc. (Medtronic). On June 25, 2002, Melton signed a consent form authorizing Dr. Feldman to implant a Medtronic Marquis ICD (the ICD) into his chest. Melton understood the purpose of the ICD was to deliver a shock to his heart if it needed regulating. However, Melton does not recall Dr. Feldman ever offering any advice on which type of ICD she would be implanting, which ones were better than others, or what the risks of implanting an ICD were. Further, according to Melton, when he asked Dr. Feldman how she chooses one company's ICD over another, she responded, "I choose according to which company's representative I like the best."
The summer after Dr. Feldman implanted the ICD, the ICD delivered an unexpected shock to Melton's heart. During his next visit, Dr. Feldman told Melton the ICD was "set at the wrong speed," and so she had a nurse adjust it accordingly. Thereafter, on the morning of June 10, 2005, Melton experienced yet another unexpected shock from the ICD as he was getting dressed. Melton's wife called for an ambulance, which took Melton to Providence Memorial Hospital.
At some point after the June 2005 incident, during a "normal defibrillator visit," a nurse informed Melton that up to 1.5 percent of the type of Medtronic ICDs that Melton had implanted in his chest "may suffer sudden and premature battery failure."[2] According to Melton, the nurse also stated Dr. Feldman "had known about the defect for about a year but [was not] allowed to tell patients that the battery might go dead at any moment. . . ." Neither the nurse nor Dr. Feldman gave Melton any advice as to whether to replace the ICD. Melton was, however, given a copy of a "Device Alert," which *649 discussed the potential defect, how to monitor the battery of an implanted ICD, and that the patient had the option of having a different ICD implanted. At one point, the Device Alert reads, "My signature below indicates that all of the information above has been explained to me including the risks and benefits of each course of action, and that I had a chance to ask questions about this information." Melton signed his name at the bottom of the Device Alert.
Melton and Dr. Feldman decided to replace the ICD with one made by Guidant. The surgery to replace the ICD was scheduled for July 6, 2005. Before that time, however, Melton read in the Wall Street Journal and other publications that Guidant, like Medtronic, was experiencing technical problems with their ICDs. When Melton called Dr. Feldman's office to discuss the surgery and the other kinds of ICDs that were available, a nurse told him Dr. Feldman was on vacation in Australia, and "if [he] wanted any information, to go to the website of the company." Upon returning from her vacation, Dr. Feldman called Melton. Melton claims Dr. Feldman was upset that Melton "didn't trust her choice of putting in a Guidant," and that she said he "shouldn't have any questions about it[.]" Ultimately, Dr. Feldman told Melton, "You don't trust me, you need to get another doctor, . . . and don't even come back to my group." Dr. Feldman did provide Melton the name of another doctor with the University of South Carolina; however, Melton never called that doctor.
Appellants commenced this action against Medtronic, Dr. Feldman, and Columbia Heart Clinic on April 17, 2006.[3] Appellants settled their claims against Medtronic. As part of discovery, the Respondents took depositions from Melton and his wife. Respondents also took depositions from three of Melton's treating physicians: his current family physician, Dr. Venegas; his former family physician, Dr. Roger Gaddy (Dr. *650 Gaddy); and his current cardiologist, Dr. John Beard (Dr. Beard). Neither Dr. Feldman nor the nurse with whom Melton spoke at Columbia Heart Clinic were deposed. Dr. Feldman and Columbia Heart Clinic moved for summary judgment on December 27, 2006.
The circuit court granted summary judgment as to all claims against the Respondents. As to Melton's causes of action for medical malpractice, negligent misrepresentation, and abandonment, the circuit court held those claims were "all de facto claims for medical malpractice" and, therefore, Melton was required to provide expert testimony. The circuit court found Melton failed to produce expert testimony establishing the standard of care, breach, and proximate causation. As to Melton's cause of action for outrage or intentional infliction of emotional distress, the circuit court found Melton presented "insufficient evidence that the conduct of [Respondents] was outrageous in any respect." As to Melton's two causes of action for breach of warranty, the circuit court held those were products liability claims. Accordingly, because neither of the Respondents was the "seller" of the ICD, summary judgment was appropriate. Finally, as to Melton's wife's action for loss of consortium, the circuit court held because her claim was dependent on Melton's claims, summary judgment was appropriate. This appeal followed.

STANDARD OF REVIEW
"The purpose of summary judgment is to expedite disposition of cases which do not require the services of a fact finder." Dawkins v. Fields, 354 S.C. 58, 69, 580 S.E.2d 433, 438 (2003). "An appellate court reviews the granting of summary judgment under the same standard applied by the trial court under Rule 56(c), SCRCP." Bovain v. Canal Ins., 383 S.C. 100, 105, 678 S.E.2d 422, 424 (2009). "Rule 56(c) of the South Carolina Rules of Civil Procedure provides that a trial court may grant a motion for summary judgment `if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" Id. (quoting Rule 56(c), SCRCP). "In determining whether any triable issues of fact exist, the evidence and all inferences *651 which can be reasonably drawn from the evidence must be viewed in the light most favorable to the nonmoving party." Hancock v. Mid-South Mgmt. Co., 381 S.C. 326, 329-30, 673 S.E.2d 801, 802 (2009).

LAW/ANALYSIS

A. Outrage/Intentional Infliction of Emotional Distress
Melton argues the circuit court erred in granting summary judgment in favor of the Respondents on his claim for outrage. We disagree.
To establish intentional infliction of emotional distress or outrage, a plaintiff must establish: (1) the defendant intentionally or recklessly inflicted severe emotional distress or was certain or substantially certain that such distress would result from his conduct; (2) the conduct was so extreme and outrageous as to exceed all possible bounds of decency and must be regarded as atrocious, and utterly intolerable in a civilized community; (3) the actions of the defendant caused the plaintiff's emotional distress; and (4) the emotional distress suffered by the plaintiff was so severe that no reasonable man could be expected to endure it. Shupe v. Settle, 315 S.C. 510, 517, 445 S.E.2d 651, 655 (Ct.App.1994). "Facts which may show extreme insensitivity on the part of the defendant do not necessarily establish the tort of outrage." Hawkins v. Greene, 311 S.C. 88, 91, 427 S.E.2d 692, 694 (Ct.App.1993).
We find no evidence in the record suggesting that Dr. Feldman or Columbia Heart Clinic acted intentionally or recklessly to inflict severe emotional distress on Melton. Moreover, while Dr. Feldman's decision to dismiss Melton as a patient so close to the date of his scheduled surgery was arguably insensitive, we can hardly deem such conduct "so extreme and outrageous as to exceed all possible grounds of decency" or "utterly intolerable in a civilized community," especially in light of the fact that Melton admitted Dr. Feldman provided him with the name of another cardiologist. Shupe, 315 S.C. at 517, 445 S.E.2d at 655.
Accordingly, we find no error in the circuit court's grant of *652 summary judgment on this cause of action.[4]

B. Abandonment and Medical Malpractice
Melton argues the tort of medical abandonment is separate from and independent of the tort of medical malpractice. Consequently, he contends the circuit court erred in characterizing his abandonment cause of action as a "de facto claim[] for medical malpractice" and analyzing it under the traditional medical malpractice framework. We disagree.
"A physician commits medical malpractice by not exercising that degree of skill and learning that is ordinarily possessed and exercised by members of the profession in good standing acting in the same or similar circumstances." David v. McLeod Reg'l Med. Ctr., 367 S.C. 242, 247, 626 S.E.2d 1, 3 (2006) (citing Durham v. Vinson, 360 S.C. 639, 650-51, 602 S.E.2d 760, 766 (2004)). "[O]nce employed, a physician must attend the case as long as it requires attention, unless the relation of physician and patient is ended by mutual consent or is revoked by the dismissal of the physician. A physician cannot abandon a case without reasonable notice to the patient." Guinan v. Tenet Healthsystems of Hilton Head, Inc., 383 S.C. 48, 56, 677 S.E.2d 32, 37 (Ct.App.2009) (citing Johnston v. Ward, 288 S.C. 603, 610, 344 S.E.2d 166, 170 (1986)).
We find no South Carolina cases explicitly recognize medical abandonment as a tort separate from medical malpractice. Melton, however, argues Johnston recognizes medical abandonment as a separate tort, and that pursuant to Johnston, expert opinion was not necessary to establish that Dr. Feldman's abandonment of Melton did not comport with the recognized and accepted standard of care. Johnston involved wrongful death and survival actions brought by an executor against a number of physicians and a hospital for medical *653 malpractice after the decedent died of a silicate overdose while at the hospital. Johnston, 288 S.C. at 605, 344 S.E.2d at 167. The only issue on appeal relating to abandonment was whether the trial court erred in allowing the psychiatrist's expert to testify that the psychiatrist's responsibility to the decedent terminated when the psychiatrist assigned care of the decedent to another doctor at the hospital. Id. at 610, 344 S.E.2d at 170.
We find Johnston does not recognize abandonment as a tort separate from medical malpractice; in fact, it illustrates that abandonment is but one form of medical malpractice. First, the court recognized at the outset of its opinion that the claim of abandonment was brought in the context of an action for medical malpractice. See Johnston, 288 S.C. at 605, 344 S.E.2d at 167 ("These wrongful death and survival actions . . . involve allegations of medical malpractice.") Second, expert testimony is required in cases involving medical malpractice claims. See David, 367 S.C. at 248, 626 S.E.2d at 3. Thus, the fact that the testimony regarding abandonment in Johnston came from an expert witness suggests that the claim for abandonment was merely part of the more general claim for medical malpractice.
A review of cases from other jurisdictions reveals medical abandonment is but one form of medical malpractice and that claims for medical abandonment are properly analyzed under the traditional medical malpractice framework. See Granek v. Texas St. Bd. of Med. Examiners, 172 S.W.3d 761, 766 n. 2 (Tex.App.2005) ("Patient abandonment is a form of breach of duty in a medical malpractice action."); Bradford v. Rossi, 249 Ga.App. 325, 548 S.E.2d 70, 71 (2001) ("A claim of abandonment, which is a tort, amounts to the same as negligent treatment. As such, the claim requires that the plaintiff file an expert affidavit.") (internal quotations and footnotes omitted); Lewis v. Capalbo, 280 A.D.2d 257, 720 N.Y.S.2d 455, 457 (N.Y.App.Div.2001) ("It is well established that a doctor who undertakes to examine and treat a patient (thus creating a doctor-patient relationship) and then abandons the patient may be held liable for medical malpractice.") (citation omitted); Norton v. Hamilton, 92 Ga.App. 727, 89 S.E.2d 809, 812 (1955) ("If a physician abandons a case without giving such notice or providing a competent physician in his place, it is a *654 failure to exercise that care required by law, which failure amounts to a tort.").
Furthermore, we find the reasoning of Linog v. Yampolsky, 376 S.C. 182, 656 S.E.2d 355 (2008) applicable to the present situation. In that case, our supreme court was asked to decide "whether South Carolina should recognize a separate and independent cause of action for medical battery, or whether such theories of liability are more properly analyzed under alternative and well-established causes of action." Id. at 187-88, 656 S.E.2d at 358. The supreme court held it should not, stating:
We see little need to recognize an additional cause of action related to tortious injuries arising out of interactions with medical providers when the tort of medical malpractice fully covers all acts performed in relation to medical services and when the remaining area of private tort law applies to acts not related to medical services.
Id. at 187, 656 S.E.2d at 358 (emphasis added).
Medical abandonment, like medical battery, would "constitute an unnecessary and superfluous cause of action." Id. Consequently, medical abandonment should be analyzed as a medical malpractice claim because the act of improperly terminating the doctor-patient relationship logically fits into the more general category of "not exercising that degree of skill and learning that is ordinarily possessed and exercised by members of the profession in good standing acting in the same or similar circumstances." David, 367 S.C. at 247, 626 S.E.2d at 3.
Accordingly, we find no error in the circuit court's ruling that Melton's claim for abandonment is a "de facto claim[] for medical malpractice."

C. Medical Malpractice
Melton argues the circuit court erred in granting summary judgment in favor of Dr. Feldman on his medical malpractice claims because he presented sufficient evidence to create a genuine issue of material fact as to that cause of action. We disagree.
*655 Medical malpractice lawsuits have specific requirements that must be satisfied in order for a genuine issue of material fact to exist. David, 367 S.C. at 247, 626 S.E.2d at 3. Specifically, a patient alleging medical malpractice must provide evidence, through expert testimony, showing (1) the generally recognized and accepted practices and procedures that would be followed by average, competent practitioners in the physician's field of medicine under the same or similar circumstances, and (2) that the physician departed from the recognized and generally accepted standards. Id. at 247, 626 S.E.2d at 4. Additionally, the plaintiff must show that the defendant's departure from such generally recognized practices and procedures was the proximate cause of his alleged injuries and damages. Id. at 248, 626 S.E.2d at 4.
Expert testimony need not come from a specialist in the same field as the defendant. See Gooding v. St. Francis Xavier Hosp., 326 S.C. 248, 253, 487 S.E.2d 596, 598 (1997) ("Defects in an expert witness' education and experience go to the weight, rather than the admissibility, of the expert's testimony"); Creed v. City of Columbia, 310 S.C. 342, 345, 426 S.E.2d 785, 786 (1993) ("A physician is not incompetent to testify merely because he is not a specialist in the particular branch of his profession involved."). However, "[r]egardless of the area in which the prospective expert witness practices, he must set forth the applicable standard of care for the medical procedure under scrutiny and he must demonstrate to the court that he is familiar with the standard of care." David, 367 S.C. at 250, 626 S.E.2d at 5. Further, if the expert merely testifies as to his own personal standard of care, rather than the generally recognized and accepted standard of care, such testimony is insufficient to survive summary judgment. See Guinan, 383 S.C. at 57, 677 S.E.2d at 37-38 (holding expert's testimony was insufficient to survive summary judgment because the testimony, at most, showed the defendant deviated from the expert's personal standard of care rather than the generally recognized and accepted standard of care).
After reviewing Melton's arguments, we distill five instances in which he believes Dr. Feldman's conduct departed from the recognized standard of care: (1) failing to properly apprise Melton of the risks involved in implanting an ICD; (2) implanting *656 a defective ICD; (3) using improper criteria to select the ICD from among other available models; (4) failing to inform Melton of the defect in the ICD and remove it in a timely manner; and (5) abandoning Melton on the "eve of surgery." We analyze each argument in turn.

1. Failure to properly advise of risks
Melton first argues Dr. Feldman committed malpractice by failing to properly inform him of the risks before implanting the ICD. We disagree.
Under the doctrine of informed consent, a physician who performs a diagnostic, therapeutic, or surgical procedure has a duty to disclose to a patient of sound mind, in the absence of an emergency that warrants immediate medical treatment, (1) the diagnosis, (2) the general nature of the contemplated procedure, (3) the material risks involved in the procedure, (4) the probability of success associated with the procedure, (5) the prognosis if the procedure is not carried out, and (6) the existence of any alternatives to the procedure. Hook v. Rothstein, 281 S.C. 541, 547, 316 S.E.2d 690, 694-95 (Ct.App.1984). The basis of the doctrine is the patient's right to exercise control over his or her own body by deciding intelligently for himself or herself whether or not to submit to the particular procedure. Id. at 547-48, 316 S.E.2d at 695. "[T]he scope of a physician's duty to disclose is measured by those communications a reasonable medical practitioner in the same branch of medicine would make under the same or similar circumstances." Id. at 553, 316 S.E.2d at 698.
"An informed consent action is no different from any other action for professional malpractice." Id. at 551, 316 S.E.2d at 696. A plaintiff must ordinarily establish the professional standard governing the scope of a physician's duty to inform a patient of the material risks inherent in a proposed treatment or procedure by expert medical evidence. Id. at 551, 316 S.E.2d at 697.
In this case, Melton failed to present evidence as to what was required of Dr. Feldman under the accepted and recognized standard of care governing informed consent between a cardiologist and patient. Neither Dr. Gaddy, Dr. Venegas, nor Dr. Beard testified as to what a cardiologist in Dr. *657 Feldman's position should have done under the circumstances in terms of disclosure.
Furthermore, Melton failed to provide evidence that Dr. Feldman's failure to apprise him of the risks of ICD implantation was the proximate cause of his injuries. Specifically, Melton did not testify that, if he had been apprised of the risks, he would have chosen not to have an ICD implanted. See Hanselmann v. McCardle, 275 S.C. 46, 48-49, 267 S.E.2d 531, 533 (1980) ("Negligence is not actionable unless it is a proximate cause of the injuries, and it may be deemed a proximate cause only when without such negligence the injury would not have occurred or could have been avoided."). When asked whether he would have changed his decision to have the ICD implanted if Dr. Feldman had "sat [him] down and went through all the details of the operation," Melton replied, "I don't know because it didn't happen . . . I guess it would depend on what I heard."
Consequently, Melton failed to create a genuine issue of fact as to whether Dr. Feldman's failure to apprise him of the risks involved in implanting the ICD constituted malpractice.

2. Implanting a Defective ICD
Respondents argue the expert testimony in this case was insufficient to establish either (1) the standard of care for cardiologists implanting ICDs, or (2) that the ICD was defective. We agree.
Dr. Gaddy testified, "I don't put pacemakers in and . . . I'm not a cardiologist." Further, when Dr. Gaddy was asked whether he was going to render "any opinions as to whether or not Dr. Feldman deviated from the standard of care as a cardiologist in rendering any treatment to the plaintiff in this case," he responded:
No, I don't think that I would. I mean, I'm not a cardiologist.
. . .
I think it would be inappropriate for me to, just as it would be inappropriate for radiologists to or urologists or anybody else of the same specialty.
*658 Similarly, Dr. Venegas testified that as a family physician, he does not implant pacemakers and he would defer to the knowledge of a cardiologist on that issue. When Dr. Venegas was asked if he believed Dr. Feldman deviated from the standard of care in her treatment of Mr. Melton, he responded, "I cannot see where from the note[s] that I've been given from [Dr. Feldman] that she deviated from the standard of care in her medical treatment of Mr. Melton."
Dr. Gaddy and Dr. Venegas[5] failed to establish the standard of care for implanting ICDs, and therefore, their testimony was insufficient to create a genuine issue of material fact. See Botehlo v. Bycura, 282 S.C. 578, 587, 320 S.E.2d 59, 65 (Ct.App.1984) (holding expert testimony by an orthopedic surgeon in a case of alleged medical malpractice by a podiatrist failed to create a genuine issue of material fact because (1) the material question in the case was the standard required of podiatrists, not orthopedic surgeons, (2) the witness admitted he was not familiar with the procedure the defendant performed, and (3) when the orthopedic surgeon was asked if he held himself out as an expert, he answered, "No, not in podiatry, no").
Furthermore, Melton presented no evidence that the battery in the ICD was defective. If anything, his testimony suggests the battery in the ICD device was working too well; the ICD activated at times when he believed his heart rate was normal. At one point, Melton testified that the battery powering the ICD "never malfunctioned between the date that it was implanted and the date it was explanted." Further, to the extent the ICD was "defective" in the sense that it was prone to over-activation, Melton also failed to present evidence that Dr. Feldman or Columbia Heart Clinic knew this at the time Dr. Feldman implanted the ICD.
Accordingly, Melton failed to create a genuine issue of material fact as to whether Dr. Feldman's implantation of the ICD, in and of itself, constituted malpractice.

3. Improper Criteria for Selecting the ICD
Respondents contend even assuming, arguendo, the expert testimony on this issue establishes both the standard of *659 care and a breach of that standard, summary judgment was nevertheless proper because Melton failed to present evidence of a causal link between Feldman's selection criteria and Melton's injuries. We agree.
When Dr. Gaddy was asked whether it would ever be proper for a physician to base the selection of a particular medical device on how much the physician liked the manufacturer's sales representative, he answered, "I never use that [as a criterion]." This testimony is insufficient to create a genuine issue of material fact because it only shows Dr. Feldman departed from Dr. Gaddy's personal standard of care; it does not show Dr. Feldman departed from the generally accepted standard of care. See Guinan, 383 S.C. at 57, 677 S.E.2d at 37-38 (holding expert's testimony was insufficient to survive summary judgment because the testimony, at most, showed the defendant deviated from the expert's personal standard of care rather than the generally accepted standard of care).
When Dr. Venegas was asked the same question, however, he stated, "Definitely not, definitely not." Instead, Dr. Venegas testified it would be proper for a physician considering a medical device or drug to evaluate it based on "[t]he benefits outweighing the risks, the appropriateness of the situation . . . the various side effects, risks, alternatives." Arguably, this testimony constitutes evidence of both the generally accepted standard of care and a breach thereof.
Ultimately, however, we need not decide whether the expert testimony establishes the standard of care or breach because Melton presented no evidence showing that Dr. Feldman's selection criteria was the proximate cause of his injuries. See David, 367 S.C. at 248, 626 S.E.2d at 4 (holding the plaintiff must show that the defendant's departure from such generally recognized practices and procedures was the proximate cause of the plaintiff's alleged injuries and damages). See also Tumblin v. Ball-Incon Glass Packaging Corp., 324 S.C. 359, 365, 478 S.E.2d 81, 84 (Ct.App.1996) (holding expert testimony is generally required to establish proximate cause in medical malpractice cases). Specifically, Melton failed to present evidence showing that, had Dr. Feldman employed different selection criteria, either (1) it would have led her to choose a different ICD, or (2) that a different ICD would not have *660 caused him the same or similar problems. Hanselmann, 275 S.C. at 48-49, 267 S.E.2d at 533 ("Negligence is not actionable unless it is a proximate cause of the injuries, and it may be deemed a proximate cause only when without such negligence the injury would not have occurred or could have been avoided.").
Accordingly, Melton failed to create a genuine issue of fact as to whether Melton's selection criteria constituted medical malpractice.

4. Failure to Timely Inform of Defect
Here again, Respondents argue even if the expert testimony establishes that Dr. Feldman's failure to inform Melton of the potential defect in the ICD was a breach of the generally accepted standard of care, there is no evidence establishing that Dr. Feldman's failure to inform Melton of the potentially defective battery was the proximate cause of any of Melton's alleged injuries. We agree.
When Dr. Gaddy was asked, "Would it be an acceptable practice for a physician to wait over a year to inform a patient [that his ICD has the potential to fail without warning][,]" he responded:
I would not think that would be appropriate. I mean, I think any time you have the potential of a problem with a device . . ., then I think it's incumbent upon [the physician] to make them aware of it.
. . .
I think [the physician] ought to let [the patient] know as soon as they are aware of it.
When Dr. Venegas and Dr. Beard were asked the same question, they responded, "That would be a long time," and "A year would be a little long," respectively. Thus, as with the testimony regarding the selection criteria, the testimony from the physicians arguably establishes that waiting a year to inform Melton was a departure from the generally recognized standard of care for any physician.
However, Melton presented no evidence establishing that Dr. Feldman's failure to inform Melton of the potential defect was the proximate cause of his injuries. None of the three *661 experts testified that, in their professional opinion, Melton's injuries resulted from Dr. Feldman's failure to inform Melton of the defect. See Martasin v. Hilton Head Health System, 364 S.C. 430, 438, 613 S.E.2d 795, 799-800 (Ct.App.2005) (citing Ellis v. Oliver, 323 S.C. 121, 125, 473 S.E.2d 793, 795 (1996)) ("When one relies solely upon the opinion of medical experts to establish a causal connection between the alleged negligence and the injury, the expert must, with reasonable certainty, state that in their professional opinion, the injuries complained of most probably resulted from the defendant's negligence.").
Furthermore, Melton testified that his injuries in this case derived, in part, from his inability to engage in his normal activities due to the fear that the ICD would discharge unexpectedly. However, this "injury" is ostensibly shared, in varying degrees, by everyone who has an ICD implanted in his or her, even a properly functioning one.[6] Consequently, even if Dr. Feldman had informed Melton of the potential defect in a timely manner and replaced the ICD with a properly functioning one, the possibility of an unexpected discharge would still loom, thereby leaving Melton in much the same state in which he now finds himself. Therefore, a jury could not have reasonably inferred a causal connection between Dr. Feldman's failure to inform and Melton's alleged injuries. See Green v. Lilliewood, 272 S.C. 186, 191, 249 S.E.2d 910, 912 (1978) (holding when both expert testimony and circumstantial evidence of a physician's culpability are presented, the inquiry is whether there was sufficient competent evidence from which the jury may have inferred a causal connection).
Accordingly, Melton failed to create a genuine issue of material fact as to whether Dr. Feldman's failure to inform him of the defect in the ICD constituted malpractice.

*662 5. Abandonment
Respondents argue Melton failed to produce evidence of the standard for dismissing a patient, breach, or proximate causation. We agree.
When Dr. Gaddy was asked whether it would be acceptable to "simply terminate the [doctor-patient] relationship without any notice," he responded, "I think it depends a lot on the circumstances around it, but I think that the best way to do it is to give them an option if they feel like . . . they're going to terminate the professional relationship." Further, when asked whether a physician has a responsibility to help the patient locate a new health care provider, he responded, "[W]hat I've done in the past [is] I usually give them the names of three doctors, that I know . . . ." At best, Dr. Gaddy's testimony establishes only his personal standard of care in terminating the doctor-patient relationship, rather than the generally recognized and accepted standard of care. As noted above, such testimony is insufficient to survive summary judgment. Guinan, 383 S.C. at 57, 677 S.E.2d at 37-38.
When Dr. Venegas was asked whether terminating a doctor-patient relationship two days before scheduled surgery would be proper, he responded, "That would not be common." When asked whether a doctor should give thirty days notice to a patient prior to termination and attempt to find another doctor for the patient, Dr. Venegas stated it would be "common practice," to do that, but that it was not "written in stone," and was not "the standard for all physicians in South Carolina." We find this testimony falls short of establishing the standard of care for terminating the doctor-patient relationship.
Finally, when Dr. Beard was asked what the proper procedure for terminating a doctor-patient relationship, he responded, "I'll tell you how I do it, and it varies probably from individual to individual. But I personally like a face-to-face encounter. . . ." Again, this testimony only established Dr. Beard's personal standard of care. Further, when asked whether it would be proper to unilaterally terminate a patient with a serious heart problem days before scheduled surgery, Dr. Beard testified:

*663 [A]gain, it depends on the situation. If you've got a really bad relationshiptrust is so important. Nobody wants to go into an operation with a doctor they don't trust, and if you have the opportunity to change it . . . that may be a better option. It's not a good thing to leave somebody hanging out, but on the other hand, trust is [] very important.
We find Dr. Beard's testimony does not establish a general standard for termination and, to the extent it does, it does not establish that Dr. Feldman's actions constituted a breach of that standard.
Accordingly, Melton failed to create a genuine issue of material fact as to whether Dr. Feldman's termination of the doctor-patient relationship constituted malpractice.

D. Common Knowledge Exception
Melton argues even if the expert testimony was insufficient to establish the generally recognized standard of care, breach, and proximate causation, expert testimony was unnecessary because the nature of the malpractice was such that the common knowledge exception should apply. We disagree.
While expert testimony is generally required in medical malpractice cases, it is not required if the subject matter lies within the ambit of common knowledge so that no special learning is required to evaluate the conduct of the defendants. See Pederson v. Gould, 288 S.C. 141, 142, 341 S.E.2d 633, 634 (1986) ("Expert testimony is not required, however, in situations where the common knowledge or experience of laymen is extensive enough for them to be able to recognize or infer negligence on the part of the doctor and also to determine the presence of the required causal link between the doctor's actions and the patient's medical problems."). "When expert testimony is not required, the plaintiff must offer evidence that rises above mere speculation or conjecture." Welch v. Whitaker, 282 S.C. 251, 258, 317 S.E.2d 758, 763 (Ct.App.1984). The application of the common knowledge exception in proving negligence in a case involving medical malpractice depends on the particular facts of the case. Sharpe v. S.C. Dept. of Mental Health, 292 S.C. 11, 14, 354 S.E.2d 778, 780 (Ct.App.1987).
*664 In support of his argument, Melton cites Green v. Lilliewood, 272 S.C. 186, 249 S.E.2d 910 (1978). In that case, a patient sued for malpractice after her physician failed to remove an intrauterine device (IUD) during her tubal ligation, despite the fact that the patient had asked the physician to remove the IUD. Id. at 189, 249 S.E.2d at 911. Our supreme court held the trial court erred in granting the defendant physician's motion for directed verdict because the plaintiff presented sufficient evidence from which the jury could have reasonably inferred the physician committed malpractice. Id. at 193, 249 S.E.2d at 913. In arriving at this conclusion, the court held, "[i]t is a matter of common knowledge that a tubal ligation renders an IUD or any other birth control device useless." Id. at 192, 249 S.E.2d at 913.
Melton asserts "it is a matter of common knowledge that a medical device powered by a battery with a shorting mechanism that causes the device to lose power without warning is defective," and that "the failure to remove the `useless' device in Green is no different than the implementation [of] and subsequent failure to remove a defective device for a year." However, we find this comparison unpersuasive. Although Melton insists on describing the ICD as "defective," in that it was subject to a potential rapid loss of power, the evidence clearly shows that was not the case with Melton's ICD. Melton even conceded that his injuries did not result from the ICD losing power. Thus, Melton's injuries, if any, could only have resulted from the ICD's tendency to discharge excessively and/or unnecessarily. We do not find it would be within the province of a lay jury to determine whether something so complex as an ICD was operating properly; to do so would not only require the jury to know the electrical ins and outs of the device itself, but also whether the discharges were brought on by a malfunction or an irregularity in Melton's heartbeat. Accordingly, Green does not support the applicability of the common knowledge exception in this case.
Melton also cites Thomas v. Dootson, 377 S.C. 293, 659 S.E.2d 253 (Ct.App.2008). In that case, a patient sued his doctor for malpractice after the patient's mouth was burned during oral surgery by an overheating drill. Id. at 295, 659 S.E.2d at 254. The doctor's counsel conceded there was an equipment malfunction and that there had "never been any *665 real dispute that a defective surgical drill resulted in the burn to [the patient's] lip." Id. On appeal, however, the doctor attempted to resurrect the need for expert testimony by arguing that because a surgical drill is such a complex machine, "the proper operation of a surgical drill is not something within the lay knowledge of jurors." Id. at 296, 659 S.E.2d at 254. This court rejected the doctor's argument because the doctor had already conceded that the drill was not functioning properly at the time of the injury, thereby removing the need for expert testimony regarding the standard of care for operating the drill properly. Id.
The Respondents made no such concession in this case. Moreover, as stated previously, the evidence in this case suggests that the battery in the ICD was functioning correctly. Accordingly, Thomas does not support the applicability of the common knowledge exception in this case.
Finally, Melton argues the common knowledge exception should apply to the analysis of the alleged abandonment, improper selection criteria, and the one-year delay in informing. However, he supports these arguments by making reference to the expert testimony. We find it contradictory for Melton to argue, on the one hand, that a jury would not need the assistance of expert testimony in this case, but then support that argument by citing to expert testimony. In sum, the common knowledge exception does not apply in this case.

CONCLUSION
Based on the foregoing, the circuit court's decision is
AFFIRMED.
FEW, C.J., and LOCKEMY, J., concur.
NOTES
[1] The trial court also granted summary judgment on Melton's causes of action against Dr. Feldman for breach of warranty of fitness for a particular purpose and express breach of warranty and on Melton's wife's claim for loss of consortium. Melton does not challenge these rulings in this appeal.
[2] The record is inconsistent as to the timing of the visit during which Melton found out about this potential defect in his ICD. Melton testified he found out about the defect after the June 10, 2005 incident that forced him to visit the hospital. However, the "Device Alert" form that informs patients about the defect was signed by Melton on May 10, 2005.
[3] Melton alleged ten causes of action: (1) products liability, negligence (against Medtronic); (2) products liability, strict liability (against Medtronic); (3) breach of warranty, merchantability (against Medtronic); (4) breach of warranty, fitness for a particular purpose (against all defendants); (5) breach of warranty, express (against all defendants); (6) medical malpractice and negligence (against all defendants); (7) negligent misrepresentation (against all defendants); (8) outrage (against Dr. Feldman); (9) abandonment (against Dr. Feldman); and (10) loss of consortium (against all defendants).
[4] Although Melton argues on appeal that Dr. Feldman's outrageous conduct consisted of implanting a defective device, failing to inform Melton of the risks involved with ICDs, failing to inform Melton for a year of the potential defect in his ICD, and abandonment, Melton's original complaint appears to limit his outrage cause of action to the alleged abandonment alone. Moreover, counsel for Melton conceded at oral argument that the abandonment was the only basis for the outrage cause of action. Consequently, we limit our analysis of the outrage cause of action to Dr. Feldman's alleged abandonment of Melton.
[5] Dr. Beard did not testify about the installation of the Medtronic ICD or whether he thought it was defective.
[6] During Melton's deposition, which was taken after he had the ICD replaced with a different Medtronic ICD, he was asked what the ICD prevented him from doing. He responded, "One thing is I thought I might die. [I] still might. . . . I try not to put myself under stress physically or mentally. I do not want this device to go off again because it is thoroughly unpleasant." He also testified his damages in this case include the "mental concern and wondering every day if this thing is going to go off or not prematurely."