702 S.E.2d 372

**Faye FLETCHER, Appellant,**

v.

**MEDICAL UNIVERSITY OF SOUTH CAROLINA, Respondent.**

No. 4732.

Court of Appeals of South Carolina.

Heard June 23, 2010.

Decided Sept. 1, 2010.

Rehearing Denied Dec. 17, 2010.

James H. Moss, of Beaufort, for Appellant.

M. Dawes Cooke, Jr., and Lucinda Gardner Wichmann, both of Charleston, for Respondent.

KONDUROS, J.

Faye Fletcher appeals the circuit court's granting of a directed verdict in favor of the Medical University of South Carolina (MUSC) on her claims for medical malpractice. We affirm in part, reverse in part, and remand.

## FACTS

Fletcher suffered from a blockage in the artery leading to her left arm. As a result, she was experiencing dizziness and numbness in the arm. Fletcher had seen Dr. Bruce Elliott about this issue, and he ordered some tests suspecting that a subclavian bypass could alleviate the problem. When the test results were received, Dr. Thomas Brothers, Dr. Elliott's partner, was in their Beaufort clinic where Fletcher was seen. Dr. Brothers testified he discussed the surgery with Fletcher although he could not specifically recall the content of that discussion. Fletcher scheduled her surgery so that it did not conflict with her work schedule and that resulted in Dr. Brothers performing the operation. Fletcher had a preoperative appointment at which time she spoke with a nurse practitioner and the anesthesiologist. She testified she was never warned of the risks associated with the procedure. Fletcher underwent the surgery on October 28, 1999. Dr. Gloria Rios, a surgical resident, assisted.[1]

Upon returning home, Fletcher experienced significant bloating, discomfort, and shortness of breath. After two days, she went to the area emergency room where it was discovered that chylothorax was leaking into her pleural cavity and her diaphragm was not functioning properly. One treating physician indicated these problems were likely a result of her recent surgery in which damage to the thoracic artery and phrenic nerve are possible complications. Fletcher was treated and did make improvements although she still suffers from significant fatigue that she testified she did not experience prior to the surgery.

Fletcher brought this medical malpractice claim against MUSC alleging Dr. Brothers and Dr. Rios were negligent in

---

1. Dr. Rios married and took the surname Marlowe after Fletcher's surgery.

performing the surgery and she was not properly advised of the risks associated with subclavian bypass. At trial, Dr. Thomas Wood testified on Fletcher's behalf and stated he believed Drs. Brothers and Rios had deviated in the standard of care during Fletcher's surgery and that as a physician, he thought it was a good idea to advise patients of the risks associated with medical procedures. Dr. Thomas Appleby testified as an expert for MUSC and opined he did not believe Drs. Brothers and Rios had deviated from the standard of care in performing Fletcher's operation and that it was the standard of care to advise patients of the risks associated with any surgical procedure. Fletcher testified she would not have undergone subclavian bypass had she known the procedure was not guaranteed to resolve her symptoms and that it could turn out the way it did. The circuit court granted a directed verdict in favor of MUSC on both claims, and this appeal followed.

## LAW/ANALYSIS

"A directed verdict should be granted where the evidence raises no issue for the jury as to the defendant's liability." *Guffey v. Columbia/Colleton Reg'l Hosp., Inc.*, 364 S.C. 158, 163, 612 S.E.2d 695, 697 (2005). On review, an appellate court will affirm the granting of a directed verdict in favor of the defendant when there is no evidence on any one element of the alleged cause of action. *Id.* "In a medical malpractice action, the plaintiff must establish proximate cause as well as the negligence of the physician." *Id.*

### I. Medical Malpractice—Negligence in Performance of Procedure

Fletcher argues the circuit court erred in granting MUSC's directed verdict motion when Dr. Wood opined Dr. Brothers and Dr. Rios deviated from the standard of care in performing her surgery. We disagree.

In a medical malpractice action the plaintiff must establish "(1) 'the generally recognized practices and procedures which would be exercised by competent practitioners in a defendant doctor's field of medicine under the same or similar circumstances,' and (2) a departure by the defendant

'from the recognized and generally accepted standards, practices and procedures....'" *Jones v. Doe*, 372 S.C. 53, 61, 640 S.E.2d 514, 518 (Ct.App.2006) (quoting *Cox v. Lund*, 286 S.C. 410, 414, 334 S.E.2d 116, 118 (1985)). Furthermore the plaintiff must present evidence that the defendant's failure to adhere to the standard of care proximately caused the complained of injury. *Id.* "The probative value of expert testimony stands or falls upon an evidentiary showing of the facts upon which the opinion is, or must logically be, predicated." *Ward v. Epting*, 290 S.C. 547, 563, 351 S.E.2d 867, 876 (Ct.App.1986).

In the present case, Dr. Wood testified the standard of care in a subclavian bypass surgery is to preserve the phrenic nerve and thoracic duct. With respect to MUSC's deviation from the standard of care, he opined:

Q. Do you have an opinion, Doctor, as to whether or not Dr. Brothers and Dr. Rios, the agents of MUSC, in performing this surgery deviated from the standard of care?

A. I think so. I think they did.

However, Dr. Wood testified on cross-examination that complications such as trauma to the phrenic nerve and damage to the thoracic duct could have occurred during this procedure even in the absence of any surgical negligence. He also testified:

Q. Do you see anything in there [the operative note and records] that indicates that Dr. Brothers used any improper technique to do this operation?

A. No.

Essentially, Fletcher asks us to conclude that the occurrence of a complication is itself evidence of negligence. However, South Carolina does not recognize the doctrine of *res ipsa loquitur*. *Snow v. City of Columbia*, 305 S.C. 544, 555 n. 7, 409 S.E.2d 797, 803 n. 7 (Ct.App.1991) ("In an action for negligence, the plaintiff must prove by direct or circumstantial evidence that the defendant did not exercise reasonable care. South Carolina's rejection of *res ipsa loquitur* is consistent with its general adherence to fault based liability in tort."). Simply no evidence establishes how Dr. Brothers or Dr. Rios deviated from the standard of care. Unfortunately,

two of the risks associated with this procedure did befall Fletcher. Nevertheless, we are not permitted to speculate that misfortune was the result of negligence in the absence of any evidence as to how the physicians deviated from the standard of care.

*Bowie v. Hearn*, 292 S.C. 223, 355 S.E.2d 550 (Ct.App.1987) (*Bowie I* ), addresses this very point. This case was reversed based on the particular facts presented, but the reasoning employed by the court of appeals is instructive. Bowie sued the physician who delivered him via cesarean section because he was cut on the cheek during the procedure, resulting in a scar. *Id.* at 224–25, 355 S.E.2d at 551. Bowie's expert testified the standard of care required the physician not to cut the baby. *Id.* at 226, 355 S.E.2d at 552. In analyzing the sufficiency of this testimony, the court alluded to another oft-cited medical malpractice case and stated:

> Under the plaintiff's reasoning in this case [*Bowie I* ] the doctors in *Cox*[2] could simply have testified that normally colons are not perforated during colonoscopies, the standard of care, therefore, is a doctor should not perforate the colon, and to do so violates the standard of care. Such reasoning would, in effect, make a doctor an insurer of perfect result in every surgical procedure. A doctor is not an insurer of health and negligence may not be inferred.

*Id.* at 227, 355 S.E.2d at 552.[3]

The analysis in *Bowie I* is precisely on point with this case, and we discern no factual basis that would cause the reasoning in that case to be inapplicable to the facts presented here.

---

**2.** *Cox v. Lund*, 286 S.C. 410, 334 S.E.2d 116 (1985). In *Cox*, the supreme court found evidence showing the defendant physician had deviated from the standard of care in failing to properly clear the patient's colon for a colonoscopy was sufficient evidence to send the malpractice action to the jury when the patient's colon was perforated during the procedure.

**3.** The supreme court found the defendant-physician's testimony that he took three or four swipes with his scalpel was enough evidence of negligence to withstand summary judgment when testimony showed the procedure for a cesarean was to make a series of progressively deepening incisions. *Bowie v. Hearn*, 294 S.C. 344, 345–46, 364 S.E.2d 469, 469–70 (1988) (*Bowie II* ). No self-incriminating testimony from Dr. Brothers in this case suggests a deviation in the standard of care.

Therefore, we affirm the circuit court's granting of a directed verdict as Fletcher presented no evidence, only speculation, that MUSC's agents deviated from the standard of care.

## II. Medical Malpractice—Lack of Informed Consent

Fletcher also contends the circuit court erred in granting MUSC's directed verdict motion with respect to her informed consent claim. We agree.

Although the circuit court's decision rested on its conclusion that Fletcher failed to present any evidence regarding proximate cause, we will address the elements of duty and breach first as they are preconditions to a finding of proximate cause, and MUSC raises them as additional sustaining grounds.[4]

Under the doctrine of informed consent, a physician has a duty to disclose "(1) the diagnosis, (2) the general nature of the contemplated procedure, (3) the material risks involved in the procedure, (4) the probability of success associated with the procedure, (5) the prognosis if the procedure is not carried out, and (6) the existence of any alternatives to the procedure." *Hook v. Rothstein*, 281 S.C. 541, 547, 316 S.E.2d 690, 694–95 (Ct.App.1984). Because the question of whether a physician has acted unreasonably often involves the exercise of medical judgment in most cases, expert medical testimony is necessary to establish negligence in failing to adequately disclose the information necessary for a patient to give informed consent. *Id.* at 551, 316 S.E.2d at 697. "Indeed, our [s]upreme [c]ourt has held that in any 'area beyond the realm of ordinary lay knowledge, expert testimony will usually be necessary to establish both the standard of care and the defendant's departure therefrom.'" *Id.* (quoting *Kemmerlin v. Wingate*, 274 S.C. 62, 65, 261 S.E.2d 50, 51 (1979)).

In the instant case, Fletcher provided a modicum of expert testimony that MUSC's agents deviated from the ac-

4. The circuit court stated: "We still have to get to the third prong [proximate cause]. I don't quarrel with anything that you said, I don't disagree with that. That's what I just said, assuming everything you've said, no question he set a standard, no question that he said that if you didn't do it, that it was a departure. The question that you asked was, did it proximately cause an injury in this case? No. No expert has testified that it did."

cepted standard of care, which allows her to withstand a motion for directed verdict. Fletcher's expert, Dr. Wood, testified as follows:

Q. Doctor, in your opinion should Dr. Brothers have informed Mrs. Fletcher of the risks associated with the thoracic duct and the phrenic nerve, prior to surgery?

A. I think it is a good idea. I believe in informing the patient what the risks are. I don't see anything wrong with it.

Q. Do you believe that is a deviation from the standard of care,—that it should be done by every physician?

A. From what I could tell from the notes, there was no opportunity for him to because he wasn't there.

Q. There wasn't any information?

A. Well, I don't think that she had a full explanation what was going to go on. And of course, everybody hopes that every operation goes as slick as it can and that everything goes perfect, but sometimes that doesn't happen.

The primary expert testimony on this point was proffered testimony from MUSC's expert, Dr. Appleby. Over the course of several pages of testimony, including references to his deposition, Dr. Appleby testified a physician should discuss risks with his patient. He further testified he considered damage to the phrenic nerve and thoracic duct to be risks of this procedure.

Q. And is it your opinion to a reasonable degree of medical certainty that a [doctor] needs to explain the material risks associated with the subclavian bypass surgery to his patient before performing it?

A. I believe they should discuss risks, yes.

Q. And is it your opinion, to a reasonable degree of medical certainty, that a thoracic duct injury and a phrenic nerve injury are material risks associated with this procedure?

A. They are low but definite risks.

With respect to whether the failure to inform Fletcher of these particular risks was a deviation from the standard of care, Dr. Appleby stated:

Q. And if a physician fails to inform his patient undergoing a subclavian bypass surgery that the phrenic nerve and/or the thoracic duct may be damaged, is that a deviation of the standard of care?

A. Not as long as he's talked about generalized risks, is what I would say. I think the standard of care mandates that you have to talk to the patient about risks. The specifics of that risk is up to the physician, the physician's judgment, and the patient and how their relationship is "maturing," I guess.

On a directed verdict motion, we are to view the evidence presented in the light most favorable to the nonmoving party. *See J.T. Baggerly v. CSX Transp., Inc.,* 370 S.C. 362, 368, 635 S.E.2d 97, 100 (2006) ("When reviewing the grant of a directed verdict, the evidence and all reasonable inferences therefrom must be viewed in the light most favorable to the party against whom the verdict was directed."). The testimony regarding the standard of care and any deviation in this case is equivocal. Nevertheless, Fletcher presented *some* evidence the standard of care is to inform a patient of potential damage to the thoracic duct and phrenic nerve and that to fail to do so is a deviation from that standard.[5]

Having determined Fletcher presented at least some evidence establishing the first two elements of her claim, the standard of care (duty) and deviation from it (negligence), we move to the third and final element in any negligence claim, proximate cause. We disagree with the circuit court's reasoning that because Fletcher failed to present expert testimony that the lack of information proximately caused her injuries, she could not succeed in her claim.

---

**5.** In *Stallings v. Ratliff,* 292 S.C. 349, 351–52, 356 S.E.2d 414, 416 (Ct.App.1987), the plaintiff presented expert testimony indicating the defendant-physician had a duty to disclose the risk of a perforated esophagus during the procedure performed. The court stated that when testimony conflicted regarding whether that information was conveyed to the patient, the jury could infer the deviation from the standard of care and a "ritual incantation of certain words" from the expert that it constituted a deviation was not necessary. *Id.* at 353, 356 S.E.2d at 417. Therefore, while Dr. Appleby's answer to the deviation question was a qualified no, it is not fatal to Fletcher's claim at the directed verdict stage.

■ The circuit court was correct in holding Fletcher had the burden to show any deviation from the standard of care was the proximate cause of her injury. *Hook,* 281 S.C. at 564, 316 S.E.2d at 704. To do so, Fletcher must show a reasonable person, having been properly informed, would have elected not to have the procedure. *Id.* at 565, 316 S.E.2d at 705. However, the circuit court misinterpreted that requirement to mean that expert testimony must establish this point.

In *Hook,* the court rejected the subjective test and adopted the objective, reasonable man test for discerning proximate cause. The court cited a Maryland case to support its decision.

[I]f a subjective [test] were applied, the testimony of the plaintiff as to what he [or she] would have hypothetically done would be the controlling consideration. Thus, proof of causation under a subjective [test] would ultimately turn on the credibility of the hindsight of a person seeking recovery after he had experienced a most undesirable result. Such a test puts the physician in "jeopardy of the patient's hindsight and bitterness." Furthermore, in cases where the plaintiff dies as a result of an unforewarned collateral consequence, the subjective [test] would bar recovery on an informed consent claim altogether.

*Hook,* 281 S.C. at 565, 316 S.E.2d at 705 (quoting *Sard v. Hardy,* 281 Md. 432, 379 A.2d 1014, 1025 (1977)).

While *Hook* adopted the objective test, nothing indicates the reasonable man test requires expert testimony. As in most cases, the determination of whether a reasonable person, knowing the risks, would have had the procedure is a question left to the fact-finder. This notion is supported by the cases *Hook* relies upon in adopting the objective test. *See Canterbury v. Spence,* 464 F.2d 772, 791 (C.A.D.C.1972) (stating the objective test requires the fact-finder to interpret the plaintiff's testimony through the filter of reasonableness in determining the proximate cause issue); *Woolley v. Henderson,* 418 A.2d 1123, 1132 (Me.1980) (agreeing with trial court's instruction to the jury to employ the objective standard in considering proximate cause); *Sard,* 379 A.2d at 1026 (stating the plaintiff's testimony is relevant although not determinative and alluding to no expert testimony regarding causation).

Assuming expert testimony was not required to establish proximate cause in this informed consent claim, we must next consider whether *any* evidence was presented that would support a finding by the jury that Fletcher, using the reasonable person standard, would not have moved forward with her subclavian bypass had she been advised of the risks. Dr. Appleby testified:

Q. Doctor, do you have an opinion to a reasonable degree of medical certainty whether a well-informed patient, one that was told of a phrenic nerve injury and chylotorax, whether that patient, given the condition that Mrs. Fletcher had, would have elected to have this procedure done?

A. I do. I think it was a reasonable operation to offer and I think it was a reasonable choice by the patient.

Fletcher's own testimony on the matter at least raises some issue with respect to the reasonableness of proceeding with the surgery having known of the risks involved.

Q. Okay. Now, had you known the risks or had you known what has occurred to you now and the risk of that, would have had this surgery?

A. No, I wouldn't have. There was—why put myself through something that wasn't even a guarantee that it was going to stay fixed? I mean, less than a year later, I was back seeing Dr. Elliott for a very similar reason. I still have that artery problem under my arm, and I guess I will die with it because I certainly am not going to put myself under the knife again. It's just everything that I have been through since I had that surgery did not make it worthwhile. Had I known that there was no guarantee that it was a fix-it, and if I had been told what happens to a phrenic nerve and all these other things, I wouldn't—I would not have been willing to take that, risk.

Fletcher's testimony is not determinative under an objective standard, but it is some evidence that proceeding with the surgery was unreasonable in light of the risks and potential outcome. The jurors could weigh this evidence against their own experiences and in light of Dr. Appleby's testimony to arrive at a conclusion concerning what a reasonable person would have done under the circumstances.

470

## CONCLUSION

We affirm the circuit court's granting of a directed verdict on Fletcher's claim of medical malpractice in performance of her surgery. We reverse the granting of a directed verdict with respect to her informed consent claim and remand that issue for a new trial. Accordingly, the decision of the circuit court is

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

GEATHERS and LOCKEMY, JJ., concur.