# THE STATE OF SOUTH CAROLINA
## In The Court of Appeals

Anita and James Chabek, Appellants,

v.

AnMed Health and Larry Davidson, MD, Respondents.

Appellate Case No. 2021-001129

---

Appeal from Anderson County
R. Lawton McIntosh, Circuit Court Judge

---

Opinion No. 6039
Heard September 14, 2023 – Filed December 13, 2023

---

## AFFIRMED IN PART, REVERSED IN PART, AND REMANDED

---

Jordan Christopher Calloway and Jay Franklin Wright, of
McGowan Hood Felder & Phillips, of Rock Hill, for
Appellants.

Marian Williams Scalise, of Myrtle Beach, and Carmen
Vaughn Ganjehsani, of Columbia, both of Richardson
Plowden & Robinson, PA, for Respondent AnMed
Health.

Fred W. Suggs, III, of Cassidy Coates Price, P.A., of
Greenville, for Respondent Larry Davidson.

---

**GEATHERS, J.:**  In this negligence action, Appellants Anita and James Chabek argue the circuit court erred in granting summary judgment in favor of Respondents AnMed Health and Dr. Larry Davidson because (1) the statute of limitations does not bar their medical negligence and negligent supervision claims, and (2) our state's informed consent doctrine permits recovery for a physician's failure to disclose personal life factors.  We affirm in part, reverse in part, and remand.

## FACTS

We have chronicled the events leading to the filing of the medical negligence and negligent supervision claims to determine their timeliness.  On August 22, 2017, Dr. Davidson, a neurosurgeon employed by AnMed Health Spine and Neurosurgery, performed spinal surgery to resect a right-sided L5/S1 synovial cyst on Anita.  Anita had been experiencing lumbar spine, right hip, and right leg pain for two years, during which time the pain had been gradually worsening.  Prior to surgery, Dr. Davidson informed Anita about the potential risks of surgery, including infection, wound healing difficulties, hemorrhage, recurrence of symptoms, paralysis, nerve injury, worsening of symptoms or neurologic status, spinal destabilization, and need for subsequent surgery for any complications discussed.   Dr. Davidson's post-surgery notes indicated that Anita tolerated the procedure "very nicely" and did not note any abnormalities.

On August 28, 2017, six days after surgery, Anita called Respondents' office and reported she was having significant right leg pain.  At her incision assessment appointment on September 1, 2017, Anita reported she continued to have pain in her right hip and leg.  Approximately two weeks later, on September 13, 2017, Anita reported her leg and hip pain continued and was prescribed additional pain medication.

Anita went to an appointment with her family medicine doctor on September 28, 2017, and stated she was frustrated she was not feeling better post-surgery.  On October 5, 2017, AnMed's office refilled Anita's pain medication.  The following day, Anita had a surgery follow-up appointment with Physician's Assistant (PA) William Jeffcoat.[1]   Anita reported continued pain but noted mild improvement following the procedure.  PA Jeffcoat informed her she was "still fairly early on in the surgical process" and encouraged her to continue exercises at the YMCA.

---

[1] It is unclear if PA Jeffcoat was present at Anita's surgery or whether he had interacted with the Chabeks at any point before this surgery.

At an appointment on November 16, 2017, Anita reported continued pain and numbness but noted slight improvement since her last visit. PA Jeffcoat's notes provided he told Anita "it could take some time for this radicular pain to improve" and instructed her on home exercises to assist in recovery. His notes also stated that if she did not report improvement at the next follow-up appointment, "we *may* need to consider repeat MRI *at a later time*." (emphasis added).

In December 2017 and January 2018, Anita called AnMed's office three times to report she was experiencing pain. During this time period, Anita had an x-ray that was "negative."[2] She also underwent an MRI in mid-January 2018. The MRI found (1) a small synovial cyst on the right L4/L5 facet joint; (2) Anita had undergone a right laminectomy with resection at the L5/S1 facet joint; and (3) moderate facet joint arthritis on the left at L5/S1 with edema in the left L5 pedicle, which was consistent with stress reaction. According to PA Jeffcoat's notes from the January 18, 2018 appointment to review the MRI results, he informed Anita the MRI showed a new, small right-sided L4/L5 synovial cyst and expected postoperative changes to the L5/S1 facet joint, but no obvious recurrent disc herniation.[3] PA Jeffcoat scheduled Anita for flexion and extension x-rays to determine if there was any obvious instability of the lumbar spine. Anita reported that her "preoperative radicular" and low back pain continued.

After her appointment to review the MRI results, Anita reached out to AnMed's office for a refill on her pain medication. Several days later, Anita reached out again with concerns about changes to the prescription and asked "if [PA Jeffcoat] knew what he was doing since he wrote the [prescription]." Two days later, Anita called again about her pain and asked if she needed "to go to pain management." Anita attended a pain management appointment with Dr. Eric Loudermilk on January 18, 2018. Dr. Loudermilk refilled her pain medication and noted that, based on the results of the MRI, the L4/L5 cyst may need to be resected, but that he would await the results of a nerve conduction study.[4]

---

[2] The record does not specify the meaning of this result.

[3] The notes state he told Anita it was the right L4/L5 facet joint that showed normal postoperative changes. Based on the context, this is presumably a typographical error because Anita's surgery was only on the right L5/S1 facet joint.

[4] Dr. Loudermilk's notes specifically stated Anita's cyst had "returned" and may need to be resected "again." His notes also reflect that he believed her original surgery was on her L4/L5 facet joint. This is incorrect because Anita's surgery was

On March 1, 2018, Anita underwent an EMG/nerve conduction study performed by Dr. Paul Brill that revealed mild, isolated, spontaneous activity in the right lower lumbar paraspinal muscles, adjacent to Anita's scar from the surgery performed by Dr. Davidson. Dr. Brill noted the finding was nonspecific and could be related to Anita's surgery. Anita also underwent the flexion and extension x-rays, which revealed no gross instability.

At an appointment on March 6, 2018, PA Jeffcoat discussed "the finding of probable medial facetectomy on the right at L5[/]S1 facet joint." PA Jeffcoat also discussed "the possibility of CT myelography of the lumbar spine to closer evaluate the integrity of the right L5[/]S1 facet joint" and noted, "[I]f [Anita] indeed has [a] missing medial facet[,] she could be dealing with some degree of instability . . . not identified on flexion and extension films." PA Jeffcoat noted the spinal instability could be "contributing to right L5[/]S1 foraminal collapse resulting in continued lower extremity pain." Anita agreed to consider the CT myelogram but wanted to hold off for a few weeks and attempt additional physical therapy. The following day, AnMed's office reached out to Anita to schedule an appointment with another doctor in the office.[5] James returned the call and stated Anita was not happy with the office and did not want to return.

In July 2018, Anita had an appointment with Dr. Gregory McLoughlin at Advanced Spine and Neurological Associates regarding her ongoing pain. Dr. McLoughlin ordered additional imaging that revealed a right fractured L5 joint which correlated with her right leg pain. Dr. McLouglin reviewed the MRI results with Anita in August 2018 and noted, "An element of instability at this level is late and this could correlate with her right leg pain."

On March 12, 2021, the Chabeks filed a notice of intent to file suit against Respondents asserting, in relevant part, medical negligence, lack of informed consent, and negligent supervision.[6] In their complaint, the Chabeks alleged Dr. Davidson negligently removed an excessive portion of the right L5/S1 facet joint

---

on her L5/S1 facet joint. Thus, the L4/L5 cyst was a new cyst, not a returning cyst, and his assessment that the cyst had returned was incorrect.

[5] The record does not provide any reason why another doctor with AnMed was going to review Anita's case.

[6] The Chabeks also brought claims of loss of household services and general negligence. The circuit court granted summary judgment on these claims on the ground they were barred by the statute of limitations. The Chabeks do not contest the circuit court's findings on these claims in their appeal to this court.

and failed to install instrumentation and perform fusion to properly support the spine following the partial medial facetectomy performed on August 22, 2017. The Chabeks also alleged that at the time leading up to, during, and after the surgery, Dr. Davidson had alcohol use disorder and had relapsed in early 2016, consuming increasingly more alcohol every day that he was not on call. According to the Chabeks' complaint, Dr. Davidson was charged with driving under the influence (DUI) in December 2017 and, as a result of the charge, reported his relapse and ongoing alcohol misuse to AnMed. The Chabeks alleged they were never informed of Dr. Davidson's alcohol misuse and did not learn of it until late 2020. They assert if Anita had been informed that Dr. Davidson was in the midst of a relapse, she would have chosen not to proceed with the surgery.

In April 2021, the Chabeks filed affidavits from Dr. Sanford Davne in which Dr. Davne stated Dr. Davidson acted negligently by (1) failing to inform patients of his alcohol misuse; and (2) failing to exercise reasonable care in performing the surgery because he negligently removed an excess portion of the right L5/S1 facet joint, did not install instrumentation, and failed to perform a fusion to properly support the spine following the facetectomy.

Respondents filed a motion to dismiss or, in the alternative, a motion for summary judgment, asserting the statute of limitations barred the Chabeks' claims. The Chabeks opposed the motion on the ground that the notice of intent to file suit was timely filed within three years of Anita's discovery of the negligence, and, in the alternative, even if the medical malpractice claim was barred, the informed consent and negligent supervision claims were not barred because the Chabeks did not discover the potential claims until late 2020. At the hearing on the motions, the Chabeks' counsel asserted Anita was repeatedly told the pain and potential spine destabilization were normal postoperative complications that could happen with a facetectomy and were not the result of negligence. Counsel stated the Chabeks decided to seek a second opinion *about her continued pain* in April 2018 and had no knowledge of even a potential injury until August 2018, when Dr. McLoughlin reviewed the MRI results with Anita. According to the Chabeks, the earliest date on which the statute of limitations for the medical negligence claim could have been triggered was August 2018. The Chabeks also argued the statute of limitations on the informed consent claim did not begin to run until late 2020, when they became aware of Dr. Davidson's alcohol misuse.

The circuit court granted Respondents' motion for summary judgment on the grounds that the claims were barred by the statute of limitations and our state's informed consent doctrine did not require a physician to disclose personal life factors. The circuit court did not pinpoint an exact date the statute of limitations

began to run but found the latest possible point was March 6, 2018, and the earliest point was August 28, 2017. According to the circuit court, the statute of limitations had lapsed when the Chabeks filed their notice of intent to file suit on March 12, 2021. The circuit court found the Chabeks' amended statement of facts was "solely a self-serving attempt to circumvent" the statute of limitations. The circuit court noted Anita began reporting postoperative pain six days after the surgery and called and presented to Respondents' office multiple times in the months following surgery, reporting continued pain and requesting additional pain medication. The court further found Anita had notice of potential instability in her spine from the MRI and nerve conduction study results. The court stated, "[S]tress injuries *can* be classified based on their time of diagnosis. An early stress injury is called a stress reaction." According to the court, the MRI results in January 2018 gave Anita notice of a stress reaction on the L5 pedicle, indicating potential instability in her spine. Further, the court remarked the EMG/nerve conduction study revealed mild, isolated, spontaneous activity that was potentially related to her surgery, which, according to the court, gave Anita notice of a stress reaction and potential instability in her spine.

With regard to the informed consent claim, the circuit court found South Carolina does not recognize that a physician's duty to disclose extends to his or her own personal, medical, or behavioral issues. The circuit court reasoned the doctrine of informed consent "relates to the risk and potential complications related to that procedure, not to 'life factors.'" The Chabeks' claim relied on the theory that a physician's active substance use disorder must be disclosed under the third *Hook* element because it was a material risk involved in the procedure.[7] The court found the third *Hook* element required disclosure of risks *of the procedure itself*, not risks related to the physician's health or behavior. The court expressed concern that expanding the doctrine of informed consent as requested in the instant case would "open[] a never-ending Pandora's box." Thus, the court found Dr. Davidson had no duty to disclose his alcohol use disorder.[8]

---

[7] *Hook v. Rothstein*, 281 S.C. 541, 547, 316 S.E.2d 690, 694–95 (Ct. App. 1984) ("Under the doctrine of informed consent, . . . a physician who performs a diagnostic, therapeutic, or surgical procedure has a duty to disclose to a patient of sound mind, in the absence of an emergency that warrants immediate medical treatment . . . (3) *the material risks involved in the procedure* . . . .").

[8] The circuit court also found the Chabeks could not advance any time-barred claim under the continuous treatment rule because our supreme court had refused to adopt the rule. Finally, with regard to James' claim for loss of household services, the court found the claim was barred by the statute of limitations because it was intertwined

The Chabeks timely filed a motion to reconsider, asserting (1) summary judgment was not proper because the date on which the statute of limitations began to run is a question of fact for the jury; (2) the statute of limitations on the medical malpractice claim did not begin to run until August 2018; (3) the statute of limitations on the lack of informed consent, negligent supervision, and general negligence claims did not begin to run until November 2020. The circuit court denied the motion to reconsider. This appeal followed.

## ISSUES ON APPEAL

I.   Did the circuit court err in granting summary judgment on the medical negligence claim on the grounds that (1) the accrual date the circuit court selected is not supported by the limited medical records Respondents submitted, and (2) the circuit court's premature summary judgment order overlooked other key legal principles governing claim accrual?

II.  Did the circuit court err in granting summary judgment on the informed consent claim?

III. Did the circuit court err in granting summary judgment on the negligent supervision claim?

## STANDARD OF REVIEW

"When reviewing a grant of summary judgment, appellate courts apply the same standard applied by the trial court pursuant to Rule 56(c), SCRCP." *Turner v. Milliman*, 392 S.C. 116, 121–22, 708 S.E.2d 766, 769 (2011). "Summary judgment is appropriate when the pleadings, depositions, affidavits, and discovery on file show there is no genuine issue of material fact such that the moving party must prevail as a matter of law." *Id.* at 122, 708 S.E.2d at 769. "When determining if any triable issues of fact exist, the evidence and all reasonable inferences must be viewed in the light most favorable to the non-moving party." *Id.* (quotation omitted). Further, the burden of establishing the statute of limitations defense is on the party seeking to impose it. *Brown v. Finger*, 240 S.C. 102, 113, 124 S.E.2d 781, 786 (1962).

## LAW/ANALYSIS

### I.   Medical Negligence

---

with the medical malpractice claim. The Chabeks do not contest either of these findings on appeal.

The Chabeks argue the circuit court erred in finding the statute of limitations barred their medical negligence claim because the claim did not accrue until, at the earliest, August 2018, when Dr. McLoughlin informed Anita the fractured L5/S1 facet joint could be the result of negligence. According to the Chabeks, this is the first point at which Anita had reason to suspect her injuries could have been a result of medical malpractice. We agree.

Section 15-3-545(A) of the South Carolina Code (2005) provides that an action to recover damages for an injury to a party arising out of any medical operation must be commenced within "three years from the date of the treatment, omission, or operation giving rise to the cause of action or three years from [the] date of discovery or when it reasonably ought to have been discovered, not to exceed six years from [the] date of occurrence." This court applies the discovery rule to determine when an action accrues. *McMaster v. DeWitt*, 411 S.C. 138, 145, 767 S.E.2d 451, 454 (Ct. App. 2014). "Under the discovery rule, the statute begins to run when 'the facts and circumstances of an injury would put a person of common knowledge and experience on notice that some right of his has been invaded or that some claim against another party might exist.'" *Id.* (quoting *Knox v. Greenville Hosp. Sys.*, 362 S.C. 566, 570, 608 S.E.2d 459, 462 (Ct. App. 2005)). The party need not know the full extent of the damage or have developed a full-blown theory of recovery for the statute of limitations to begin to run. *Johnston v. Bowen*, 313 S.C. 61, 64, 437 S.E.2d 45, 47 (1993). When there is conflicting testimony regarding the time discovery should have occurred, it becomes an issue for the jury to decide. *Brown*, 240 S.C. at 113, 124 S.E.2d at 786.

A review of the record fails to provide any support to the circuit court's finding Anita knew or reasonably ought to have known there was a potential cause of action before March 12, 2018—three years before the filing of the notice of intent to file suit. Anita's alleged injury is the excessive removal of the facet joint and failure to install proper instrumentation to stabilize the spine. Anita reported pain in the months following her surgery; however, she also reported mild improvement. Pain following a surgery is not surprising, nor does it indicate that further inquiry is needed beyond pain management. Continuing or worsening of symptoms was a known potential complication of the surgery. PA Jeffcoat assured her for several months it was a normal postoperative complication. Anita even requested, and was referred to, a pain management physician for a consult.

The diagnostic testing similarly includes no hints of potential injury from the surgery. The March 1, 2018 EMG/nerve conduction study performed by Dr. Paul Brill had only one finding—mild, isolated, spontaneous activity near her surgery scar. Dr. Brill explicitly noted the finding was nonspecific. While the study

indicated the activity *may be related to* the surgery, PA Jeffcoat did not discuss any concerns related to this finding with Anita. This finding and PA Jeffcoat's lack of concern would not put any reasonable person on notice there could be a potential injury caused by Dr. Davidson's potential negligent performance of the surgery. The flexion and extension x-ray testing similarly revealed no concerns. The MRI found, in relevant part, moderate facet joint arthritis on the left at L5/S1 with edema in the left L5 pedicle consistent with a stress reaction. At the January 18 appointment, PA Jeffcoat told Anita the right L5/S1 facet joint showed expected postoperative changes and there was no recurrent disc herniation. PA Jeffcoat's initial discussion of the findings with Anita revealed no concerns about the stress reaction or potential instability. The circuit court states a stress reaction is an early reaction to a stress injury. However, none of the medical records indicated Anita was ever informed a stress reaction finding relates to a stress injury or that the stress reaction was not a known complication or normal course post-surgery. Anita would not have known that a stress reaction near the surgery site was abnormal. Without a medical professional explaining why this finding was concerning, Anita, a layperson, cannot be expected to have a medical professional's knowledge of MRI findings. *McMaster*, 411 S.C. at 145, 767 S.E.2d at 454 (holding that "[u]nder the discovery rule, the statute begins to run when 'the facts and circumstances of an injury would *put a person of common knowledge and experience* on notice that some right of his has been invaded or that some claim against another party might exist'" (emphasis added)).

PA Jeffcoat did mention a finding of a probable medial facetectomy on the right L5/S1 facet joint and the potential instability in Anita's spine at the March 6 appointment. However, his notes do not specify the source of the finding of a probable facetectomy, and, as discussed above, none of the diagnostic testing indicated this finding. Further, knowledge of the potential destabilization would not put Anita on notice of potential negligence because it was a known potential complication of the surgery and none of the imaging indicated any instability at that point. While PA Jeffcoat suggested additional diagnostic testing at the March 6 appointment, he approved additional physical therapy and postponed the proposed diagnostic testing. The facts and circumstances do not suggest anything more than a medical professional's attempt to root out the cause of a patient's pain.

The circuit court misconstrued the evidence by suggesting Anita's decision to discontinue care with Respondents indicated she was aware there was a potential claim and sought a second opinion. Throughout her care, Anita was actively engaged in seeking to discover the cause of her pain. She did not sit on her hands and idly wait until years later to investigate her pain to only then discover potential

negligence. *See Stokes-Craven Holding Corp. v. Robinson*, 416 S.C. 517, 526, 787 S.E.2d 485, 490 (2016) ("One purpose of a statute of limitations is to relieve the courts of the burden of trying stale claims when a plaintiff has slept on his or her rights." (quoting *Kelly v. Logan, Jolley & Smith, L.L.P.*, 383 S.C. 626, 632, 682 S.E.2d 1, 4 (Ct. App. 2009))). Anita underwent multiple diagnostic tests and pursued physical therapy. She told AnMed she was unhappy with the care she was receiving, particularly with regard to her pain management—going so far as to question if PA Jeffcoat "knew what he was doing." She specifically requested a pain management consult. Pain management is a normal postoperative concern and a known complication that does not necessarily indicate medical negligence during surgery. Anita's unhappiness with the postoperative results and complaints all related to PA Jeffcoat's response to what Anita had been told were known risks of the surgery. PA Jeffcoat provided conflicting statements about the results of diagnostic testing. Anita may have been unhappy with the care she received, but the facts and circumstances in the record could not put any reasonable person on notice there was a potential claim or even injury related to negligent performance of the surgery. *See McMaster*, 411 S.C. at 145, 767 S.E.2d at 454 (holding "[u]nder the discovery rule, the statute begins to run when 'the facts and circumstances of an injury would *put a person of common knowledge and experience* on notice that some right of his has been invaded or that some claim against another party might exist.'" (emphasis added) (citation omitted)). The earliest Anita could be put on notice of a potential claim was August 2018 when Dr. McLoughlin alerted her to the fracture on the right L5 facet joint. Only then would a reasonable person have been put on notice that some claim against Respondents may exist.

As a result, we reverse the circuit court's finding that the medical negligence claim was barred by the statute of limitations and remand for findings consistent with this opinion.

## II. Informed Consent[9]

The Chabeks argue the informed consent doctrine does not limit required disclosure of material risks involved in the procedure to only the physiological risks. The Chabeks assert the doctrine is broad and requires disclosure of the treating physician's personal, medical, and behavioral issues. We disagree.

"The basis of the doctrine [of informed consent] is the patient's right to exercise control over his or her own body by deciding intelligently for himself or

---

[9] AnMed asserts the informed consent issue is not preserved for appellate review. We find the issue was preserved.

herself whether or not to submit to the particular procedure." *Hook*, 281 S.C. at 557–58, 316 S.E.2d at 695; *see also Harvey v. Strickland*, 350 S.C. 303, 310, 566 S.E.2d 529, 533 (2022) ("The right to control the integrity of one's own body spawned the doctrine of informed consent."). "An informed consent action is no different from any other action for professional malpractice. Underlying every medical malpractice action is the basic principle that the physician departed from a standard of reasonable medical care." *Hook*, 281 S.C. at 551, 316 S.E.2d at 696–97.

South Carolina courts have recognized a physician has a broad duty to warn of "the dangers associated with medical treatment" including all the "attendant risks and effects." *Hardee v. Bio-Medical Applications of S.C., Inc.*, 370 S.C. 511, 516, 636 S.E.2d 629, 631–32 (2006). In *Hook*, this court provided:

> Under the doctrine of informed consent, . . . a physician who performs a diagnostic, therapeutic, or surgical procedure has a duty to disclose to a patient of sound mind, in the absence of an emergency that warrants immediate medical treatment, (1) the diagnosis, (2) the general nature of the contemplated procedure, (3) *the material risks involved in the procedure*, (4) the probability of success associated with the procedure, (5) the prognosis if the procedure is not carried out, and (6) the existence of any alternatives to the procedure.

281 S.C. at 547, 316 S.E.2d at 694–95 (emphasis added). The *Hook* court held, "[T]he scope of a physician's duty to disclose is measured by those communications a reasonable medical practitioner in the same branch of medicine would make under the same or similar circumstances. We also hold that the plaintiff must ordinarily establish this standard by expert medical evidence." *Id.* at 553, 316 S.E.2d at 698; *see also Fletcher v. Med. Univ. of S.C.*, 390 S.C. 458, 465, 702 S.E.2d 372, 375 (Ct. App. 2010) ("Because the question of whether a physician has acted unreasonably often involves the exercise of medical judgment in most cases, expert medical testimony is necessary to establish negligence in failing to adequately disclose the information necessary for a patient to give informed consent.").

The circuit court relied on persuasive authorities from Georgia and Pennsylvania to find our state's informed consent doctrine did not require disclosure of a physician's personal life factors. Georgia's informed consent doctrine is narrow and constrained by state statute that defines material risks as those physiological complications inherent to the procedure. *See Albany Urology Clinic, P.C. v. Cleveland*, 528 S.E.2d 777, 782 (Ga. 2000) ("[N]either the common law nor

[statutory law] impose[s] a duty upon physicians or any other professional to disclose personal life factors which might adversely affect their professional performance."); *see id.* at 779 n.9 (quoting Georgia's informed consent statute, which requires a physician to disclose the "the generally recognized and accepted material risks of infection, allergic reaction, disfigurement, brain or heart damage, etc. associated with the procedure"). Pennsylvania's informed consent doctrine arises from the common law and only requires the physician to inform the patient of a specific list of disclosures that are inherent to the procedure itself. *See Duttry v. Patterson*, 771 A.2d 1255, 1258–59 (Pa. 2001) (noting the informed consent doctrine required a physician impart information "relative only to the surgery itself" including "the nature of the operation to be performed, the seriousness of it, the organs of the body involved, the disease or incapacity sought to be cured, and the possible results").

While the Georgia and Pennsylvania statutes may be helpful, our current precedent on the informed consent doctrine sufficiently addresses the issue in this case and supports the circuit court's finding. Our state's informed consent doctrine is not statutorily defined, nor is it narrowly defined to encompass only specific physiological risks. Our doctrine is broad and flexible, but it is not without its boundaries. The third *Hook* element requires disclosure of "material risks *involved in the procedure*." 281 S.C. at 547, 316 S.E.2d at 694–95 (emphasis added). The requirement is procedure-specific, not physician-specific. Further, the risk must be involved in the procedure *itself*. The personal life factors of the physician performing the procedure are not inherent to the procedure and are not contemplated by *Hook* or its progeny.

As a result, we affirm the circuit court's conclusion because our state's informed consent doctrine does not require a physician to disclose personal life factors.

## III.   Negligent Supervision Claim

The Chabeks assert the circuit court erred in granting summary judgment on the negligent supervision cause of action because the statute of limitations began to run when Anita discovered facts indicating AnMed was aware of Dr. Davidson's (1) history of alcoholism, and (2) exhibition of signs and symptoms of alcoholism in late 2020. We agree.

> In circumstances where an employer knew or should have
> known that its employment of a specific person created an
> undue risk of harm to the public, a plaintiff may claim that

the employer was itself negligent in hiring, supervising, or training the employee, or that the employer acted negligently in entrusting its employee with a tool that created an unreasonable risk of harm to the public.

*James v. Kelly Trucking Co.*, 377 S.C. 628, 631, 661 S.E.2d 329, 330 (2008).

The circuit court did not separately address the negligent supervision claim. Instead, the court dismissed this claim, along with the others, as barred by the statute of limitations.

The negligent supervision claim relies on the theory that AnMed did not properly supervise Dr. Davidson because it was aware Dr. Davidson had alcohol use disorder and he was in the midst of a relapse, yet did nothing to mitigate potential harm. The only evidence proffered by either party was the claim that Anita did not become aware of Dr. Davidson's alcohol use until late 2020. Respondents failed to offer any evidence contrary to this claim. The record is devoid of any indication that the Chabeks knew or should have known through reasonable diligence that AnMed was aware of or should have been aware of Dr. Davidson's alcohol misuse before late 2020. *See Turner*, 392 S.C. at 122, 708 S.E.2d at 769 (holding summary judgment is appropriate when the pleadings, depositions, affidavits, and discovery on file show there is no genuine issue of material fact such that the moving party must prevail as a matter of law). As a result, we reverse the circuit court's finding that the negligent supervision claim was barred by the statute of limitations and remand for findings consistent with this opinion.

Accordingly, the decision of the circuit court is

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

**THOMAS and KONDUROS, JJ., concur.**